10-3581-cv (L)
SEC v. Gabelli

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

------------

August Term 2010

(Argued: June 2, 2011          Decided: August 1, 2011)

Docket Nos. 10-3581-cv(L), 10-3628-cv(XAP), 10-3760-cv (XAP)

- - - - - - - - - - - - - - - - - - - - - - - X

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff-Appellant/Cross-Appellee,

- against -

MARC J. GABELLI and BRUCE ALPERT,

Defendants-Appellees/Cross-Appellants.

- - - - - - - - - - - - - - - - - - - - - - - X

Before:   LIVINGSTON and CHIN, Circuit Judges, and
          RAKOFF, District Judge.[*]

Appeal from a final order and judgment of the United States District Court for the Southern District of New York granting in part defendants' motions to dismiss.  REVERSED.

> DOMINICK V. FREDA (Jacob H. Stillman, Hope Hall Augustini, on the brief), Securities and Exchange Commission, Washington, D.C., for Plaintiff-Appellant.
>
> LEWIS J. LIMAN (Kimberly C. Spiering, Katherine L. Wilson-Milne, David R. Lurie, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, New York, for Defendant-Appellee Gabelli.

---

[*] The Honorable Jed S. Rakoff, United States District Judge for the Southern District of New York, sitting by designation.

KATHLEEN N. MASSEY (Edward A. McDonald, Joshua I. Sherman, on the brief), Dechert LLP, New York, New York, for Defendant-Appellee Alpert.

RAKOFF, District Judge.

Plaintiff-appellant the Securities and Exchange Commission ("SEC") appeals from a judgment entered August 17, 2010, dismissing the SEC's complaint against Marc J. Gabelli, the portfolio manager of the mutual fund Gabelli Global Growth Fund ("GGGF" or the "Fund"), and Bruce Alpert, the chief operating officer for the Fund's adviser, Gabelli Funds, LLC ("Gabelli Funds" or the "Adviser").  For the following reasons, we REVERSE the District Court's judgment and REMAND for further proceedings consistent with this opinion.[1]

**BACKGROUND**

Unless otherwise noted, the following facts are taken from the complaint and are presumed to be true.  In essence, the SEC's complaint charges defendants with failing to disclose favorable treatment accorded one GGGF investor in preference to other investors: specifically, the fact that Gabelli Funds, investor adviser to GGGF, while prohibiting most GGGF investors from engaging in a form of short-term trading called "market timing," secretly permitted one investor to market time the Fund in exchange for an investment in a hedge fund managed by Gabelli.

---

[1] Defendants Gabelli and Alpert have each filed cross-appeals, but for the reasons stated herein we do not reach the cross-appeals.

-2-

Compl. ¶¶ 1, 20-21, 17, 31, 35-38, 42, 44-45.

## A. Market Timing

"Market timing" refers, inter alia, to buying and selling mutual fund shares in a manner designed to exploit short-term pricing inefficiencies. See Exemptive Rule Amendments of 2004: The Independent Chair Condition (Apr. 2005) ("Staff Report"), available at http://www.sec.gov/news/studies/indchair.pdf. A mutual fund sells and redeems its shares based on the fund's net asset value ("NAV") for that day, which is usually calculated at the close of the U.S. markets at 4:00 P.M. Eastern Time. Prior to 4:00 P.M., market timers either buy or redeem a fund's shares if they believe that the fund's last NAV is "stale," i.e., that it lags behind the current value of a fund's portfolio of securities as priced earlier in the day. The market timers can then reverse the transaction at the start of the next day and make a quick profit with relatively little risk.

Mutual funds like GGGF that invest in overseas securities are especially vulnerable to a kind of market timing known as "time zone arbitrage," whereby market timers take advantage of the fact that the foreign markets on which such funds' portfolios of securities trade have already closed (thereby setting the closing prices for the underlying securities) before the close of U.S. markets.[2] Market timers profit from purchasing or redeeming

---

[2] An illustration of time zone arbitrage is provided in the SEC's complaint:

fund shares based on events occurring after foreign market closing prices are established, but before the events have been reflected in the fund's NAV. In order to turn a quick profit, market timers then reverse their positions by either redeeming or purchasing the fund's shares the next day when the events are reflected in the NAV.

Although market timing is not itself illegal, market timing can harm long-term investors in the fund by "rais[ing] transaction costs for a fund, disrupt[ing] the fund's stated portfolio management strategy, requir[ing] a fund to maintain an elevated cash position [to satisfy redemption requests], ... result[ing] in lost opportunity costs and forced liquidations ... unwanted taxable capital gains for fund shareholders and [a reduction of] the fund's long term performance." Id. at 32-33. See also Janus Capital Grp. Inc. v. First Derivative Traders, --

---

For example, a U.S. mutual fund may hold shares of a Japanese company traded on the Tokyo Stock Exchange ("TSE"). Because of the time-zone difference, the TSE may close at 2:00 a.m. EST. If the U.S. mutual fund uses the TSE closing price for the Japanese company's stock to calculate the mutual fund's NAV at 4:00 p.m. EST, that fund's NAV will be based, at least partially, on market information that is fourteen hours old. Positive market movements during the New York trading day, which will later cause the Japanese market to rise when it opens at 8 p.m. EST, will not be incorporated into the fund's NAV, thereby cause the NAV to be artificially low. On such a day, a trader who buys the U.S. fund at the artificially low or "stale" price can realize a profit the next day by selling the U.S. fund's shares.

See Compl. ¶ 17.

U.S. --, 131 S. Ct. 2296, 2300 (2011) ("Although market timing is legal, it harms other investors in the mutual fund.").

B. The Parties

Gabelli Funds, an investment adviser within the meaning of Section 2(a)(20) of the Investment Company Act of 1940 and Section 202(a)(11) of the Investment Advisers Act of 1940 (the "Advisers Act"), is the investment adviser to GGGF, an open end investment company, or mutual fund, registered under the Investment Company Act. Compl. ¶¶ 12-13. Marc Gabelli was the portfolio manager for GGGF and its predecessor fund from 1997 to 2004 and also managed several Gabelli-affiliated hedge funds. Id. ¶ 10. From 1988 to 2003, Bruce Alpert was Gabelli Funds' chief operating officer and the person who directed the Adviser's "market timing police," a group of GGGF employees that monitored trading in the Adviser's mutual funds in order to restrict market timing. Id. ¶¶ 1, 11, 31. Najy N. Nasser was the chief investment adviser to Folkes Asset Management, now called Headstart Advisers Ltd. ("Headstart"). Id. ¶¶ 1, 10.

C. The Alleged Misconduct

The complaint alleges that from 1999 until 2002, Gabelli and Alpert permitted Headstart to engage in time zone arbitrage (which defendants referred to as "scalping") that took advantage of stale pricing opportunities in GGGF. Id. ¶¶ 17, 36, 42. Initially the amount of such scalping was limited, but on April 7, 2000, Gabelli allegedly agreed to permit Headstart to increase

its market timing capacity from $7 million to $20 million, in exchange for a $1 million investment by Headstart in a hedge fund that Gabelli managed. Id. ¶ 21. Headstart's $1 million investment, which constituted approximately four percent of Gabelli's hedge fund's assets, was made the day after Headstart's increase in market timing. Id. ¶ 23.

Between April 2000 and the Spring of 2002, Headstart's increased market timing in GGGF's shares regularly involved between four and fifteen percent of GGGF's assets. Id. ¶ 24. Eventually, however, following instructions from the Fund's parent company, Gabelli and Alpert caused Headstart to reduce its ownership in GGGF and, in August 2002, to cease its market timing activity, whereupon Headstart redeemed its remaining investment in Gabelli's hedge fund. Id. ¶¶ 25-28.

Prior to the cessation, however, and during the same period that Gabelli and Alpert were approving Headstart's market timing in GGGF shares, Alpert and Gabelli banned at least 48 other GGGF accounts from market timing and rejected market timing purchases totaling at least $23 million. Id. ¶ 35. As early as December 2000, Alpert drafted an internal memorandum that explained that since "Market Timers (scalpers) have been using the International and Global Funds in a way that is disruptive to the Fund and the management of the portfolio," the Adviser was making efforts to "identify each account and restrict them for purchasing the funds." Id. ¶ 31. For the next two years, "market timing

-6-

police" -- employees instructed by Alpert to monitor market timing activity within Gabelli Funds -- reviewed purchases in global funds: if it appeared that the purchase was a market timing trade, the purchase was rejected and sometimes the account was banned from making future purchases. <u>Id.</u> Yet, during the very same period, Alpert instructed the market timing police to ignore Headstart's market timing activity because "it was a Marc Gabelli client relationship," and assured Nasser that Headstart's accounts would not be blocked. <u>Id.</u> ¶¶ 33, 35.

According to the complaint, Headstart's market timing unfairly favored Headstart over all other GGGF investors. Thus, while Headstart's three accounts that market timed GGGF shares during the relevant period earned rates of return of 185 percent, 160 percent, and 73 percent, respectively, the rate of return for all other GGGF shareholders over the same period was, at best, negative 24.1 percent. <u>Id.</u> ¶¶ 2, 39. Headstart's market timing also caused annual dilution ranging from one to four percent of GGGF's assets. <u>Id.</u>

While Headstart was market timing GGGF, the defendants allegedly did not disclose to GGGF's Board of Directors or to the other GGGF shareholders that Headstart was market timing, that it was being given an advantage accorded no other shareholder, and that there was a conflict of interest created by the agreement with Headstart. As a result, the Board was allegedly misled into believing that the Adviser was taking all necessary steps to

reduce or ban market timing activity in general. Id. ¶¶ 36-38. For example, on February 21, 2001, Alpert and Gabelli attended a GGGF Board meeting where they each addressed the Board. Alpert told the Board about the dangers of market timing and the efforts that Gabelli Funds was undertaking to eliminate this practice, but failed to disclose that Headstart was being permitted to market time GGGF. Immediately after Alpert's report, Gabelli reported on operations of GGGF, but also failed to disclose Headstart's market timing. After the meeting, Alpert and Gabelli continued to allow Headstart to engage in market timing trades. Id.

According to the complaint, even after the market timing ceased, the defendants continued to mislead the Board and GGGF investors. In particular, on September 3, 2003 -- the same day that the New York Attorney General announced he was investigating market timing in mutual funds -- Alpert, in an alleged effort to reassure GGGF investors, posted a memorandum (the "Memorandum") on the website of Gabelli Funds' parent company. Id. ¶¶ 43-44. The Memorandum stated that:

> [F]or more than two years, scalpers have been identified and restricted or banned from making further trades. Purchases from accounts with a history of frequent trades were rejected. Since August 2002, large transactions in the global, international and gold funds have been rejected without regard to the past history. While these procedures were in place they did not completely eliminate all timers.

Id. ¶ 44. In light of what Gabelli and Alpert knew and, indeed, had authorized in market timing by Headstart, this Memorandum,

-8-

the complaint alleges, was materially misleading. Id. ¶ 45.

Finally, the complaint alleges that because of the secret nature of the defendants' wrongdoing, as well as the defendants' affirmative misrepresentations to GGGF's Board and shareholders, the SEC did not discover the fraud until late 2003. Id. ¶¶ 46-47.

On April 24, 2008, the SEC filed its complaint against the defendants, alleging in its First Claim that Alpert had violated the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, in its Second Claim that Alpert had violated the antifraud provisions of Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and in its Third Claim that both Alpert and Gabelli had aided and abetted violations by the Adviser of the antifraud provisions of Sections 206(1) and 206(2) of the Advisers Act, 15 U.S.C. 80b-6(1) & (2). As relief for these violations, the SEC sought injunctions against future violations, disgorgement of ill-gotten gains, and civil monetary penalties.

On July 25, 2008, each of the defendants moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted. On March 17, 2010, the District Court granted the defendants' motions in substantial part. First, the District Court dismissed the Securities Act and Securities Exchange Act claims against

Alpert, finding that Alpert's statement in the Memorandum that "for more than two years, scalpers have been identified and restricted or banned from making further trades" was "literally true" and that because "this statement was not a misrepresentation ... Alpert had no duty to disclose fully Headstart's market-timing."  SEC v. Gabelli, No. 08 Civ. 3868 (DAB), 2010 WL 1253603, at *8 (S.D.N.Y. Mar. 17, 2010).  Second, while the District Court denied defendants' motion to dismiss the Advisers Act claim, it ruled that the SEC could not seek civil penalties for that claim because: (a) the SEC did not bring the claim within the statute of limitations period applicable to such penalties, and (b) the SEC is not authorized to seek monetary penalties for aiding and abetting violations of the Advisers Act. Id. at *4-5, 11-12.  Third, the District Court dismissed the SEC's prayer for injunctive relief because the SEC "has not plausibly alleged that Defendants are reasonable likely to engage in future violations."  Id. at *11.  Thus, the SEC's Advisers Act claim against the defendants survived the motions to dismiss, but the District Court barred all relief other than disgorgement.

Believing that disgorgement would not provide significant relief, the SEC moved to voluntarily dismiss the remaining claim without prejudice to the SEC's refiling this claim if, but only if, the SEC were successful in this appeal.  The District Court granted the motion over the defendants' objections and entered judgment accordingly.

The SEC now appeals the District Court's dismissal of its Securities Act and Securities Exchange Act claims against Alpert and the District Court's rejection of the SEC's prayers for civil penalties and injunctive relief for the defendants' aiding and abetting violations of the Advisers Act. In addition to opposing the SEC's appeal, both defendants have cross-appealed, contending that the District Court erred in denying their motions to dismiss the SEC's prayer for disgorgement under the Advisers Act and, more generally, in denying their motions to dismiss with prejudice the SEC's claim for aiding and abetting violations of the Advisers Act.

**DISCUSSION**

A. Appellate Jurisdiction

We first address whether we have jurisdiction to hear the instant appeals. We generally lack jurisdiction over an "appeal from a dismissal of some of plaintiff's claims when the balance of the claims have been dismissed without prejudice pursuant to a Rule 41(a) dismissal of the action," because permitting such an appeal would allow the parties to "effectively ... secure[] an otherwise unavailable interlocutory appeal." Chappelle v. Beacon Commc'ns Corp., 84 F.3d 652, 654 (2d Cir. 1996). However, in Purdy v. Zeldes, 337 F.3d 253, 258 (2d Cir. 2003), we recognized an exception to this rule where "a plaintiff's ability to reassert a claim is made conditional on obtaining a reversal from

-11-

this court." Id. Under these circumstances, a judgment may be deemed "final," because the plaintiff "runs the risk that if his appeal is unsuccessful, his ... case comes to an end." Id.

Given Purdy, it is clear that we have jurisdiction to consider the SEC's appeal, since the only dismissal that was without prejudice was expressly conditioned on the SEC's promise not to reassert this claim unless its appeal of this dismissal was successful on appeal. However, given the strong policy against interlocutory appeals, we see no reason to extend the narrow exception announced in Purdy to the defendants' cross-appeals. Nor do we think we should exercise pendent appellate jurisdiction over the cross-appeals. The doctrine of pendent appellate jurisdiction -- which "allows us, where we have jurisdiction over an interlocutory appeal of one ruling, to exercise jurisdiction over other, otherwise unappealable interlocutory decisions," see Myers v. Hertz Corp., 624 F.3d 537, 552 (2d Cir. 2010) (internal quotation marks omitted) -- "should be exercised sparingly, if ever," Bolmer v. Oliveira, 594 F.3d 134, 141 (2d Cir. 2010) (internal quotation marks omitted). Assuming the doctrine applies here at all, we see here none of the "exceptional circumstances," Papineau v. Parmley, 465 F.3d 46, 65 (2d Cir. 2006) (internal quotation marks omitted), that would warrant its invocation at this juncture. We therefore limit ourselves to the SEC's appeal.

B. Standard of Review

-12-

Turning to the merits of that appeal, we review the District Court's grant of the motions to dismiss de novo, "accept[ing] all well-pleaded allegations in the complaint as true [and] drawing all reasonable inferences in the plaintiff's favor." Operating Local 649 Annual Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010). To survive a motion to dismiss, however, a complaint must "allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

C. The Securities Act and Securities Exchange Act Claims against Alpert

Applying these standards, we first consider whether the District Court erred in dismissing the Securities Act and Securities Exchange Act claims against Alpert that were premised on the theory that his statements in the Memorandum of 2003 were materially misleading. That Memorandum, as noted, stated that "for more than two years, scalpers have been identified and restricted or banned from making further trades" but that the Adviser "did not completely eliminate all timers." The District Court was apparently of the view that because such statements were "literally true," they could not be misleading. See Gabelli, 2010 WL 1253603, at *8.

The law is well settled, however, that so-called "half-truths" -- literally true statements that create a materially

-13-

misleading impression -- will support claims for securities fraud. See List v. Fashion Park, Inc., 340 F.2d 457, 462 (2d Cir. 1965); see also Rule 10b-5, 17 C.F.R. § 240.10b-5. Here, the complaint plausibly alleges that a reasonable investor reading the Memorandum would conclude that the Adviser had attempted in good faith to reduce or eliminate GGGF market timing across the board, whereas, as Alpert well knew but failed to disclose, the Adviser had expressly agreed to let one major investor, Headstart, engage in a very large amount of GGGF market timing, in return for Headstart's investment in a separate hedge fund run by Gabelli. The District Court therefore erred in dismissing the Securities Act and Securities Exchange Act claims.

Alpert further argues, however, that even if the statements in the Memorandum were misleading, the District Court's determination can be affirmed on either of two alternate grounds: a failure to adequately allege materiality or a failure to adequately allege intent.

As to materiality, "a complaint may not properly be dismissed ... on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (internal quotation marks omitted). Here, the complaint alleges that, pursuant to an undisclosed agreement between the defendants and

-14-

Headstart, the latter was permitted to engage in market time trading up to $20 million per transaction and completed 836 such transactions over a three year period. In total, Headstart allegedly traded $4.2 billion in GGGF, approximately 62 percent of the total value of all trading in the Fund during that period, and earned $9.7 million in profits while other GGGF investors, who were not only themselves precluded from such trading but also unaware of its being undertaken by Headstart, suffered annual losses of at least 24.1%. Compl. ¶¶ 21, 40.

Although the negative economic impact of these massive trades on GGGF's assets was less severe, see Compl. ¶ 2, it was still sufficient to create a jury issue as to its materiality. And, in any event, the notion that a reasonable investor would regard as immaterial the failure to disclose the secret arrangement by which the Fund and its Adviser, in return for a pay-off to another fund, allowed one GGGF investor to engage in highly profitable market timing while denying this opportunity to all other investors, borders on the frivolous.

As to intent, the complaint alleges that Alpert knew, or was reckless in not knowing, that the statements in the Memorandum were misleading, because, inter alia, Alpert -- the author of the Memorandum that reasonably gave the impression that the Adviser was making best efforts to eliminate scalping -- had himself given the order to the market timing "police" to let Headstart continue its massive market timing, and because, as he also knew,

-15-

Headstart was being given the preference in return for a secret pay-off in the form of an investment in Gabelli's hedge fund. Also, contrary to Alpert's contention that the complaint fails to allege that he knew market timing was harmful to the Fund, the complaint alleges that Alpert redeemed his own holdings in GGGF because, as he told a fellow Gabelli Funds officer, "Marc Gabelli was allowing the GGGF to be scalped." Compl. ¶ 42. Accordingly, we find that the complaint adequately states claims against Alpert for violations of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act.

D. Civil Penalties

We next turn to whether the District Court erred in dismissing the prayer for civil penalties under the Advisers Act on the alternative grounds that (a) the SEC is not permitted to seek civil penalties in connection with a claim for aiding and abetting violations of the Advisers Act, and (b) the claim for civil penalties is time-barred. The first ground is plainly wrong, for this Court has previously held that civil penalties may be assessed in connection with such a claim. See SEC v. DiBella, 587 F.3d 553, 571-72 (2d Cir. 2009) (holding that because a "'violation' of the Advisers Act" includes the aiding and abetting of principal violations of the Advisers Act, "the civil penalty provision encompasses both primary and secondary violators of the Advisers Act").

As for the alternative ground, the relevant statute of

limitations is set forth in 28 U.S.C. § 2462, which provides that a claim for civil penalties must be brought within five years "from the date when the claim first <u>accrued</u>." 28 U.S.C. § 2462 (emphasis supplied). Because the complaint charges violations of the antifraud provisions of the Advisers Act,[3] the SEC argues that the claim did not "accrue" until September 2003 when, as the complaint alleges, the SEC first discovered the fraud. This, the SEC argues, is because the determination of accrual under § 2462 is subject to the fraud-based discovery rule -- "a doctrine that delays accrual of a cause of action until the plaintiff has 'discovered' it," or in the exercise of due diligence, should have discovered it, <u>see</u> <u>Merck & Co. v. Reynolds</u>, -- U.S. --, 130 S. Ct. 1784, 1793-94 (2010). The defendants respond that since no reference to the discovery rule appears in the plain language of 28 U.S.C. § 2462, the SEC's claim for civil penalties accrued in August 2002, the last instance of Headstart's market timing in GGGF. In addition, defendant Gabelli argues that the discovery rule cannot save the SEC's claims against him because he did not take affirmative steps to conceal his misconduct.

As an initial matter, we note that Gabelli's latter argument reflects the all-too-common mistake by which the discovery rule is "sometimes confused with the concept of fraudulent concealment

---

[3] Specifically, the Third Claim alleges violations of Section 206(1) of the Advisers Act, which prohibits "any device, scheme, or artifice to defraud," and Section 206(2), which prohibits any practice that "operates as a fraud or deceit."

-17-

of a cause of action," see <u>Pearl v. City of Long Beach</u>, 296 F.3d 76, 80 (2d Cir. 2002), and we take this opportunity to once again clarify that these two doctrines are distinct. Under the discovery rule, the statute of limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff. As a general matter, this rule does not govern the accrual of most claims because most claims do not involve conduct that is inherently self-concealing. However, since fraud claims by their very nature involve self-concealing conduct, it has been long established that the discovery rule applies where, as here, a claim sounds in fraud. As the Supreme Court recently stated in <u>Merck</u>, "[t]his Court long ago recognized that something different was needed in the case of fraud, where a defendant's deceptive conduct may prevent a plaintiff from even <u>knowing</u> that he or she has been defrauded." 130 S. Ct. at 1793 (emphasis in original). <u>See also</u> <u>TRW Inc. v. Andrews</u>, 534 U.S. 19, 37 (2001) (Scalia, J., concurring) (the discovery rule is a "historical exception for suits based on fraud"). Thus, contrary to Gabelli's contention, the discovery rule applies to fraud claims "though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." <u>Bailey v. Glover</u>, 88 U.S. (21 Wall.) 342, 348 (1874). <u>See also</u> John P. Dawson, *Fraudulent Concealment and*

*Statues of Limitation*, 31 MICH. L. REV. 875, 880 (May 1933) ("Where undiscovered 'fraud' was the basis of liability, it was universally agreed that no new concealment was necessary.").

The fraudulent concealment doctrine, by contrast, is an equitable tolling doctrine, not an accrual doctrine. Under the fraudulent concealment doctrine, even when a claim has already accrued, a plaintiff may benefit from equitable tolling in the event that the defendant took specific steps to conceal her activities from the plaintiff. Thus, whereas the discovery rule does not ordinarily apply to non-fraud claims (as it is generally expected that a plaintiff will be able to discover the conduct underlying non-fraud claims), the fraudulent concealment doctrine may be used to toll the limitations period for non-fraud claims where the plaintiff is able to establish that the defendant took affirmative steps beyond the allegedly wrongful activity itself to conceal her activity from the plaintiff.

In this case, since the Advisers Act claim is made under the antifraud provisions of that Act and alleges that the defendants aided and abetted Gabelli Funds' fraudulent scheme, we hold that the discovery rule defines when the claim accrues and, correlatively, that the SEC need not plead that the defendants took affirmative steps to conceal their fraud. Although the defendants make much of the fact that Section 2462 does not expressly state a discovery rule, this Court has previously held

that for claims that sound in fraud a discovery rule is read into the relevant statute of limitation.  See Dabney v. Levy, 191 F.2d 201, 205 (2d Cir. 1951) (Hand, J.) ("[I]n cases of 'fraud' ... when Congress does not choose expressly to say the contrary, the period of limitation set by it only begins to run after the injured party has discovered, or has failed in reasonable diligence to discover, the wrong.") (internal quotations omitted).  Indeed, the Supreme Court has recently affirmed that a fraud claim "accrues" only when the plaintiff discovers the fraud.  Merck, 130 S. Ct. at 1793-94.  Thus, while Congress might have to affirmatively include language about a discovery rule in the event that it wanted a discovery rule to govern the accrual of non-fraud claims or wanted to impose a limit on using a discovery rule for certain fraud claims, it would be unnecessary for Congress to expressly mention the discovery rule in the context of fraud claims, given the presumption that the discovery rule applies to these claims unless Congress directs otherwise.[4] See Holmberg v. Armbrecht, 327 U.S. 392, 397 (1946) (the discovery rule for claims of fraud "is read into every federal statute of limitation.") (emphasis added).

---

[4] The defendants' reliance on 3M Co. v. Browner, 17 F.3d 1453 (D.C. Cir. 1994), is misplaced, since it did not involve fraud claims but concerned violations of the Toxic Substances Control Act.  Id. at 1460-63.  As the Seventh Circuit recently observed in SEC v. Koenig, 557 F.3d 736, 739 (7th Cir. 2009), "[w]e need not decide when a 'claim accrues' for the purpose of § 2462 generally, because the nineteenth century recognized a special rule for fraud, a concealed wrong."

The defendants then argue that even if the discovery rule applies, the SEC's prayer for civil penalties must still fail because the SEC has not pled reasonable diligence. Cf. SEC v. Koenig, 557 F.3d 736, 739 (7th Cir. 2009) (pursuant to discovery rule, "a victim of fraud has the full time from the date that the wrong came to light, or would have done had diligence been employed"). They claim that all of the evidence that GGGF was being harmed by market timing was publicly disclosed in periodic reports with the SEC and that, with reasonable diligence, the SEC's claims could have been discovered within Section 2462's five year limitations period. But the entire argument is, at best, premature. The "lapse of a limitations period is an affirmative defense that a defendant must plead and prove," Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 426 (2d Cir. 2008), and dismissing claims on statute of limitations grounds at the complaint stage "is appropriate only if a complaint clearly shows the claim is out of time." Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999). Here, since the complaint expressly alleges that the SEC first discovered the facts of defendants' fraudulent scheme in late 2003, therefore, applying the discovery rule, the claim for civil penalties claims is not clearly time-barred.[5] Finding that at this stage in the

---

[5] Indeed, the Seventh Circuit has observed that requiring the SEC to plead why it did not discover a fraud sooner would be "nonsensical" as it would require a plaintiff to "prove a negative" in the complaint. Marks v. CDW Computer Ctrs., Inc.,

-21-

litigation defendants have not met their burden of demonstrating that a reasonably diligent plaintiff would have discovered this fraud prior to September 2003, we conclude that the SEC's prayer for civil penalties survives defendants' motions to dismiss and must be reinstated.

E. Injunctive Relief

Finally, we turn to whether the District Court erred in dismissing the SEC's prayer for injunctive relief.  In determining whether injunctive relief is appropriate, "[t]he critical question ... is whether there is a reasonable likelihood that the wrong will be repeated."  SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972).  We first observe that where, as here, the complaint plausibly alleges that defendants intentionally violated the federal securities laws, it is most unusual to dismiss a prayer for injunctive relief at this preliminary stage of the litigation, since determining the likelihood of future violations is almost always a fact-specific inquiry.[6]  Indeed, the defendants are unable to point to a single case where the SEC's prayer for injunctions against further

---

122 F.3d 363, 368 n.2 (7th Cir. 1997) (internal quotation marks omitted).

[6] For present purposes, we simply assume without deciding that a complaint must include sufficient factual allegations to plausibly allege not only a "claim to relief," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007) (construing Fed. R. Civ. P. 8(a)(2)), but also a "demand for the relief sought," Fed. R. Civ. P. 8(a)(3).

-22-

violations was dismissed at the motion to dismiss stage based upon a finding of non-likelihood of further violations.  In any event, since the complaint alleges that for almost three years Gabelli and Alpert intentionally aided and abetted Advisers Act violations and since "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations," see id., we conclude that the complaint sufficiently pleads a reasonable likelihood of future violations and thus reverse the District Court's dismissal of the SEC's prayer for injunctive relief.

CONCLUSION

For the foregoing reasons, we grant the SEC's appeal in all respects, dismiss the cross-appeals for want of appellate jurisdiction, and remand to the District Court for proceedings consistent with this opinion.