(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## GABELLI ET AL. *v*. SECURITIES AND EXCHANGE COMMISSION

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

No. 11–1274.   Argued January 8, 2013—Decided February 27, 2013

The Investment Advisers Act makes it illegal for investment advisers to defraud their clients, 15 U. S. C. §§80b–6(1), (2), and authorizes the Securities and Exchange Commission to bring enforcement actions against investment advisers who violate the Act, or against individuals who aid and abet such violations, §80b–9(d).  If the SEC seeks civil penalties as part of those actions, it must file suit "within five years from the date when the claim first accrued," pursuant to a general statute of limitations that governs many penalty provisions throughout the U. S. Code, 28 U. S. C. §2462.

   In 2008, the SEC sought civil penalties from petitioners Alpert and Gabelli.  The complaint alleged that they aided and abetted investment adviser fraud from 1999 until 2002.  Petitioners moved to dismiss, arguing in part that the civil penalty claim was untimely.  Invoking the five-year statute of limitations in §2462, they pointed out that the complaint alleged illegal activity up until August 2002 but was not filed until April 2008.  The District Court agreed and dismissed the civil penalty claim as time barred.  The Second Circuit reversed, accepting the SEC's argument that because the underlying violations sounded in fraud, the "discovery rule" applied, meaning that the statute of limitations did not begin to run until the SEC discovered or reasonably could have discovered the fraud.

*Held*: The five-year clock in §2462 begins to tick when the fraud occurs, not when it is discovered.  Pp. 4–11.

   (a) This is the most natural reading of the statute.  "In common parlance a right accrues when it comes into existence."  *United States* v. *Lindsay*, 346 U. S. 568, 569.  The "standard rule" is that a claim accrues "when the plaintiff has '"a complete and present cause of ac-

tion.'"" *Wallace* v. *Kato*, 549 U. S. 384, 388.  Such an understanding
appears in cases and dictionaries from the 19th century, when the
predecessor to §2462 was enacted.  And this reading sets a fixed date
when exposure to the specified Government enforcement efforts ends,
advancing "the basic policies of all limitations provisions: repose,
elimination of stale claims, and certainty about a plaintiff's oppor-
tunity for recovery and a defendant's potential liabilities." *Rotella* v.
*Wood*, 528 U. S. 549, 555.  Pp. 4–5.

  (b) The Government nonetheless argues that the discovery rule
should apply here.  That doctrine is an "exception" to the standard
rule, and delays accrual "until a plaintiff has 'discovered'" his cause
of action.  *Merck & Co.* v. *Reynolds*, 559 U. S. ___, ___.  It arose from
the recognition that "something different was needed in the case of
fraud, where a defendant's deceptive conduct may prevent a plaintiff
from even *knowing* that he or she has been defrauded."  *Ibid.*  Thus
"where a plaintiff has been injured by fraud and 'remains in igno-
rance of it without any fault or want of diligence or care on his part,
the bar of the statute does not begin to run until the fraud is discov-
ered.'"  *Holmberg* v. *Armbrecht*, 327 U. S. 392, 397.  This Court, how-
ever, has never applied the discovery rule in this context, where the
plaintiff is not a defrauded victim seeking recompense, but is instead
the Government bringing an enforcement action for civil penalties.
The Government's case is not saved by *Exploration Co.* v. *United
States*, 247 U. S. 435.  There, the discovery rule was applied in favor
of the Government, but the Government was itself a victim; it had
been defrauded and was suing to recover its loss.  It was not bringing
an enforcement action for penalties.

  There are good reasons why the fraud discovery rule has not been
extended to Government civil penalty enforcement actions.  The dis-
covery rule exists in part to preserve the claims of parties who have
no reason to suspect fraud.  The Government is a different kind of
plaintiff.  The SEC's very purpose, for example, is to root out fraud,
and it has many legal tools at hand to aid in that pursuit.  The Gov-
ernment in these types of cases also seeks a different type of relief.
The discovery rule helps to ensure that the injured receive recom-
pense, but civil penalties go beyond compensation, are intended to
punish, and label defendants wrongdoers.  Emphasizing the im-
portance of time limits on penalty actions, Chief Justice Marshall
admonished that it "would be utterly repugnant to the genius of our
laws" if actions for penalties could "be brought at any distance of
time." *Adams* v. *Woods*, 2 Cranch 336, 342.  Yet grafting the discov-
ery rule onto §2462 would raise similar concerns.  It would leave de-
fendants exposed to Government enforcement action not only for five
years after their misdeeds, but for an additional uncertain period into

Syllabus

the future. And repose would hinge on speculation about what the Government knew, when it knew it, and when it should have known it. Deciding when the Government knew or reasonably should have known of a fraud would also present particular challenges for the courts, such as determining who the relevant actor is in assessing Government knowledge, whether and how to consider agency priorities and resource constraints in deciding when the Government reasonably should have known of a fraud, and so on. Applying a discovery rule to Government penalty actions is far more challenging than applying the rule to suits by defrauded victims, and the Court declines to do so. Pp. 5–11.

653 F. 3d 49, reversed and remanded.

ROBERTS, C. J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 11–1274

---

## MARC J. GABELLI AND BRUCE ALPERT, PETITIONERS *v.* SECURITIES AND EXCHANGE COMMISSION

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

[February 27, 2013]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Investment Advisers Act makes it illegal for investment advisers to defraud their clients, and authorizes the Securities and Exchange Commission to seek civil penalties from advisers who do so. Under the general statute of limitations for civil penalty actions, the SEC has five years to seek such penalties. The question is whether the five-year clock begins to tick when the fraud is complete or when the fraud is discovered.

## I

### A

Under the Investment Advisers Act of 1940, it is unlawful for an investment adviser "to employ any device, scheme, or artifice to defraud any client or prospective client" or "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 54 Stat. 852, as amended, 15 U. S. C. §§80b–6(1), (2). The Securities and Exchange Commission is authorized to bring enforcement actions

against investment advisers who violate the Act, or individuals who aid and abet such violations. §80b–9(d).

As part of such enforcement actions, the SEC may seek civil penalties, §§80b–9(e), (f) (2006 ed. and Supp. V), in which case a five-year statute of limitations applies:

> "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon." 28 U. S. C. §2462.

This statute of limitations is not specific to the Investment Advisers Act, or even to securities law; it governs many penalty provisions throughout the U. S. Code. Its origins date back to at least 1839, and it took on its current form in 1948. See Act of Feb. 28, 1839, ch. 36, §4, 5 Stat. 322.

### B

Gabelli Funds, LLC, is an investment adviser to a mutual fund formerly known as Gabelli Global Growth Fund (GGGF). Petitioner Bruce Alpert is Gabelli Funds' chief operating officer, and petitioner Marc Gabelli used to be GGGF's portfolio manager.

In 2008, the SEC brought a civil enforcement action against Alpert and Gabelli. According to the complaint, from 1999 until 2002 Alpert and Gabelli allowed one GGGF investor—Headstart Advisers, Ltd.—to engage in "market timing" in the fund.

As this Court has explained, "[m]arket timing is a trading strategy that exploits time delay in mutual funds' daily valuation system." *Janus Capital Group, Inc.* v. *First Derivative Traders*, 564 U. S. ___, ___, n. 1 (2011)

(slip op., at 2, n. 1). Mutual funds are typically valued once a day, at the close of the New York Stock Exchange. Because funds often hold securities traded on different exchanges around the world, their reported valuation may be based on stale information. If a mutual fund's reported valuation is artificially low compared to its real value, market timers will buy that day and sell the next to realize quick profits. Market timing is not illegal but can harm long-term investors in a fund. See *id.,* at ___–___, and n. 1 (slip op., at 2–3, and n. 1).

The SEC's complaint alleged that Alpert and Gabelli permitted Headstart to engage in market timing in exchange for Headstart's investment in a hedge fund run by Gabelli. According to the SEC, petitioners did not disclose Headstart's market timing or the *quid pro quo* agreement, and instead banned others from engaging in market timing and made statements indicating that the practice would not be tolerated. The complaint stated that during the relevant period, Headstart earned rates of return of up to 185%, while "the rate of return for long-term investors in GGGF was no more than negative 24.1 percent." App. 73.

The SEC alleged that Alpert and Gabelli aided and abetted violations of §§80b–6(1) and (2), and it sought civil penalties under §80b–9. Petitioners moved to dismiss, arguing in part that the claim for civil penalties was untimely. They invoked the five-year statute of limitations in §2462, pointing out that the complaint alleged market timing up until August 2002 but was not filed until April 2008. The District Court agreed and dismissed the SEC's civil penalty claim as time barred.[1]

The Second Circuit reversed. It acknowledged that

_____

[1] The SEC also sought injunctive relief and disgorgement, claims the District Court found timely on the ground that they were not subject to §2462. Those issues are not before us.

§2462 required an action for civil penalties to be brought within five years "from the date when the claim first accrued," but accepted the SEC's argument that because the underlying violations sounded in fraud, the "discovery rule" applied to the statute of limitations. As explained by the Second Circuit, "[u]nder the discovery rule, the statute of limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff." 653 F. 3d 49, 59 (2011). The court concluded that while "this rule does not govern the accrual of most claims," it *does* govern the claims at issue here. *Ibid.* As the court explained, "for claims that sound in fraud a discovery rule is read into the relevant statute of limitation." *Id.,* at 60.[2]

We granted certiorari. 567 U. S. ___ (2012).

## II

## A

This case centers around the meaning of 28 U. S. C. §2462: "an action . . . for the enforcement of any civil fine, penalty, or forfeiture . . . shall not be entertained unless commenced within five years from the date when the claim first accrued." Petitioners argue that a claim based on fraud accrues—and the five-year clock begins to tick— when a defendant's allegedly fraudulent conduct occurs.

That is the most natural reading of the statute. "In common parlance a right accrues when it comes into existence . . . ." *United States* v. *Lindsay*, 346 U. S. 568, 569

––––––––––

[2] The court distinguished the discovery rule, which governs when a claim accrues, from doctrines that toll the running of an applicable limitations period when the defendant takes steps beyond the challenged conduct itself to conceal that conduct from the plaintiff. 653 F. 3d, at 59–60. The SEC abandoned any reliance on such doctrines below, and they are not before us. See Response and Reply Brief for SEC Appellant/Cross-Appellee in No. 10–3581 (CA2), p. 34 ("The Commission is not seeking application of the fraudulent concealment doctrine or other equitable tolling principles").

(1954). Thus the "standard rule" is that a claim accrues "when the plaintiff has a complete and present cause of action." *Wallace* v. *Kato*, 549 U. S. 384, 388 (2007) (internal quotation marks omitted); see also, *e.g., Bay Area Laundry and Dry Cleaning Pension Trust Fund* v. *Ferbar Corp. of Cal.*, 522 U. S. 192, 201 (1997); *Clark* v. *Iowa City*, 20 Wall. 583, 589 (1875). That rule has governed since the 1830s when the predecessor to §2462 was enacted. See, *e.g., Bank of United States* v. *Daniel*, 12 Pet. 32, 56 (1838); *Evans* v. *Gee*, 11 Pet. 80, 84 (1837). And that definition appears in dictionaries from the 19th century up until today. See, *e.g.,* 1 A. Burrill, A Law Dictionary and Glossary 17 (1850) ("an action *accrues* when the plaintiff has a right to commence it"); Black's Law Dictionary 23 (9th ed. 2009) (defining "accrue" as "[t]o come into existence as an enforceable claim or right").

This reading sets a fixed date when exposure to the specified Government enforcement efforts ends, advancing "the basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella* v. *Wood*, 528 U. S. 549, 555 (2000). Statutes of limitations are intended to "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Railroad Telegraphers* v. *Railway Express Agency, Inc.*, 321 U. S. 342, 348–349 (1944). They provide "security and stability to human affairs." *Wood* v. *Carpenter*, 101 U. S. 135, 139 (1879). We have deemed them "vital to the welfare of society," *ibid.*, and concluded that "even wrongdoers are entitled to assume that their sins may be forgotten," *Wilson* v. *Garcia*, 471 U. S. 261, 271 (1985).

## B

Notwithstanding these considerations, the Government

argues that the discovery rule should apply instead.
Under this rule, accrual is delayed "until the plaintiff has
'discovered'" his cause of action. *Merck & Co.* v. *Reynolds*,
559 U. S. ___, ___ (2010) (slip op., at 8). The doctrine arose
in 18th-century fraud cases as an "exception" to the stand-
ard rule, based on the recognition that "something differ-
ent was needed in the case of fraud, where a defendant's
deceptive conduct may prevent a plaintiff from even *know-
ing* that he or she has been defrauded." *Ibid.* This Court
has held that "where a plaintiff has been injured by fraud
and 'remains in ignorance of it without any fault or want
of diligence or care on his part, the bar of the statute does
not begin to run until the fraud is discovered.'" *Holmberg*
v. *Armbrecht*, 327 U. S. 392, 397 (1946) (quoting *Bailey* v.
*Glover*, 21 Wall. 342, 348 (1875)). And we have explained
that "fraud is deemed to be discovered when, in the exer-
cise of reasonable diligence, it could have been discovered."
*Merck & Co.*, *supra,* at ___ (slip op., at 9) (internal quota-
tion marks and alterations omitted).

But we have never applied the discovery rule in this
context, where the plaintiff is not a defrauded victim
seeking recompense, but is instead the Government bring-
ing an enforcement action for civil penalties. Despite the
discovery rule's centuries-old roots, the Government cites
no lower court case before 2008 employing a fraud-based
discovery rule in a Government enforcement action for
civil penalties. See Brief for Respondent 23 (citing *SEC* v.
*Tambone*, 550 F. 3d 106, 148–149 (CA1 2008); *SEC* v.
*Koenig*, 557 F. 3d 736, 739 (CA7 2009)). When pressed at
oral argument, the Government conceded that it was
aware of no such case. Tr. of Oral Arg. 25. The Govern-
ment was also unable to point to any example from the
first 160 years after enactment of this statute of limita-
tions where it had even asserted that the fraud discovery
rule applied in such a context. *Id.,* at 26–27 (citing only
*United States* v. *Maillard*, 26 F. Cas. 1140, 1142 (No.

15,709) (SDNY 1871), a "fraudulent concealment" case, see n. 2, *supra*).

Instead the Government relies heavily on *Exploration Co.* v. *United States*, 247 U. S. 435 (1918), in an attempt to show that the discovery rule should benefit the Government to the same extent as private parties. See, *e.g.,* Brief for Respondent 10–11, 16, 17, 33–34, 41–45. In that case, a company had fraudulently procured land from the United States, and the United States sued to undo the transaction. The company raised the statute of limitations as a defense, but this Court allowed the case to proceed, concluding that the rule "that statutes of limitations upon suits to set aside fraudulent transactions shall not begin to run until the discovery of the fraud" applied "in favor of the Government as well as a private individual." *Exploration Co., supra*, at 449. But in *Exploration Co.,* the Government was itself a victim; it had been defrauded and was suing to recover its loss. The Government was not bringing an enforcement action for penalties. *Exploration Co.* cannot save the Government's case here.

There are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties. The discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury. Usually when a private party is injured, he is immediately aware of that injury and put on notice that his time to sue is running. But when the injury is self-concealing, private parties may be unaware that they have been harmed. Most of us do not live in a state of constant investigation; absent any reason to think we have been injured, we do not typically spend our days looking for evidence that we were lied to or defrauded. And the law does not require that we do so. Instead, courts have developed the discovery rule, providing that the statute of limitations in fraud cases should typically begin to run

only when the injury is or reasonably could have been discovered.

The same conclusion does not follow for the Government in the context of enforcement actions for civil penalties. The SEC, for example, is not like an individual victim who relies on apparent injury to learn of a wrong. Rather, a central "mission" of the Commission is to "investigat[e] potential violations of the federal securities laws." SEC, Enforcement Manual 1 (2012). Unlike the private party who has no reason to suspect fraud, the SEC's very purpose is to root it out, and it has many legal tools at hand to aid in that pursuit. It can demand that securities brokers and dealers submit detailed trading information. *Id.,* at 44. It can require investment advisers to turn over their comprehensive books and records at any time. 15 U. S. C. §80b–4 (2006 ed. and Supp. V). And even without filing suit, it can subpoena any documents and witnesses it deems relevant or material to an investigation. See §§77s(c), 78u(b), 80a–41(b), 80b–9(b) (2006 ed.).

The SEC is also authorized to pay monetary awards to whistleblowers, who provide information relating to violations of the securities laws. §78u–6 (2006 ed., Supp. V). In addition, the SEC may offer "cooperation agreements" to violators to procure information about others in exchange for more lenient treatment. See Enforcement Manual, at 119–137. Charged with this mission and armed with these weapons, the SEC as enforcer is a far cry from the defrauded victim the discovery rule evolved to protect.

In a civil penalty action, the Government is not only a different kind of plaintiff, it seeks a different kind of relief. The discovery rule helps to ensure that the injured receive recompense. But this case involves penalties, which go beyond compensation, are intended to punish, and label defendants wrongdoers. See *Meeker* v. *Lehigh Valley R. Co.*, 236 U. S. 412, 423 (1915) (a penalty covered by the

predecessor to §2462 is "something imposed in a punitive way for an infraction of a public law"); see also *Tull* v. *United States*, 481 U. S. 412, 422 (1987) (penalties are "intended to punish culpable individuals," not "to extract compensation or restore the status quo").

Chief Justice Marshall used particularly forceful language in emphasizing the importance of time limits on penalty actions, stating that it "would be utterly repugnant to the genius of our laws" if actions for penalties could "be brought at any distance of time." *Adams* v. *Woods*, 2 Cranch 336, 342 (1805). Yet grafting the discovery rule onto §2462 would raise similar concerns. It would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future. Repose would hinge on speculation about what the Government knew, when it knew it, and when it should have known it. See *Rotella*, 528 U. S., at 554 (disapproving a rule that would have "extended the limitations period to many decades" because such a rule was "beyond any limit that Congress could have contemplated" and "would have thwarted the basic objective of repose underlying the very notion of a limitations period").

Determining when the Government, as opposed to an individual, knew or reasonably should have known of a fraud presents particular challenges for the courts. Agencies often have hundreds of employees, dozens of offices, and several levels of leadership. In such a case, when does "the Government" know of a violation? Who is the relevant actor? Different agencies often have overlapping responsibilities; is the knowledge of one attributed to all?

In determining what a plaintiff should have known, we ask what facts "a reasonably diligent plaintiff would have discovered." *Merck & Co.*, 559 U. S., at \_\_\_ (slip op., at 8). It is unclear whether and how courts should consider agency priorities and resource constraints in applying that

test to Government enforcement actions. See *3M Co.* v. *Browner*, 17 F. 3d 1453, 1461 (CADC 1994) ("An agency may experience problems in detecting statutory violations because its enforcement effort is not sufficiently funded; or because the agency has not devoted an adequate number of trained personnel to the task; or because the agency's enforcement program is ill-designed or inefficient; or because the nature of the statute makes it difficult to uncover violations; or because of some combination of these factors and others"). And in the midst of any inquiry as to what it knew when, the Government can be expected to assert various privileges, such as law enforcement, attorney-client, work product, or deliberative process, further complicating judicial attempts to apply the discovery rule. See, *e.g.,* App. in No. 10–3581 (CA2), p. 147 (Government invoking such privileges in this case, in response to a request for documents relating to the SEC's investigation of Headstart); see also *Rotella*, *supra,* at 559 (rejecting a rule in part due to "the controversy inherent in divining when a plaintiff should have discovered" a wrong).

To be sure, Congress has expressly required such inquiries in some statutes. But in many of those instances, the Government is itself an injured victim looking for recompense, not a prosecutor seeking penalties. See, *e.g.,* 28 U. S. C. §§2415, 2416(c) (Government suits for money damages founded on contracts or torts). Moreover, statutes applying a discovery rule in the context of Government suits often couple that rule with an absolute provision for repose, which a judicially imposed discovery rule would lack. See, *e.g.,* 21 U. S. C. §335b(b)(3) (limiting certain Government civil penalty actions to "6 years after the date when facts material to the act are known or reasonably should have been known by the Secretary but in no event more than 10 years after the date the act took place"). And several statutes applying a discovery

rule to the Government make some effort to identify the official whose knowledge is relevant. See 31 U. S. C. §3731(b)(2) (relevant knowledge is that of "the official of the United States charged with responsibility to act in the circumstances").

Applying a discovery rule to Government penalty actions is far more challenging than applying the rule to suits by defrauded victims, and we have no mandate from Congress to undertake that challenge here.

\*          \*          \*

As we held long ago, the cases in which "a statute of limitation may be suspended by causes not mentioned in the statute itself . . . are very limited in character, and are to be admitted with great caution; otherwise the court would make the law instead of administering it." *Amy* v. *Watertown (No. 2)*, 130 U. S. 320, 324 (1889) (internal quotation marks omitted). Given the lack of textual, historical, or equitable reasons to graft a discovery rule onto the statute of limitations of §2462, we decline to do so.

The judgment of the United States Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*