**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-2326

FEDERAL ENERGY REGULATORY COMMISSION,

    Petitioner – Appellee,

v.

POWHATAN ENERGY FUND, LLC; HOULIAN "ALAN" CHEN; HEEP FUND,
INC.; CU FUND, INC.,

    Respondents – Appellants.

------------------------------

EDISON ELECTRIC INSTITUTE; ELECTRIC POWER SUPPLY
ASSOCIATION; ENERGY TRADING INSTITUTE,

    Amici Supporting Appellants.

Appeal from the United States District Court for the Eastern District of Virginia, at
Richmond.  M. Hannah Lauck, District Judge.  (3:15-cv-00452-MHL)

Argued:  December 11, 2019      Decided:  February 11, 2020

Before WILKINSON, KEENAN, and DIAZ, Circuit Judges.

Affirmed and remanded by published opinion. Judge Wilkinson wrote the opinion, in
which Judge Keenan and Judge Diaz joined.

**ARGUED**: John N. Estes III, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C., for Appellants. Anand Ram Viswanathan, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Appellee. ON BRIEF: Patrick R. Hanes, Jonathan T. Lucier, WILLIAMS MULLEN, Richmond, Virginia, for Appellant Powhatan Energy Fund, LLC. Donna M. Byrne, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Washington, D.C.; Abbe David Howell, WINSTON & STRAWN LLP, Washington, D.C., for Appellants Houlian Chen, HEEP Fund Inc., and CU Fund Inc. Larry R. Parkinson, Director, Office of Enforcement, Geo. F. Hobday, Jr., Director, Courtney Spivey Urschel, Deputy Director, Division of Investigations, David Morenoff, Deputy General Counsel, Robert H. Solomon, Solicitor, Samuel G. Backfield, Lisa L. Owings, Mark E. Nagle, Daniel T. Lloyd, Elizabeth K. Canizares, FEDERAL ENERGY REGULATORY COMMISSION, Washington, D.C., for Appellee. Emily Fisher, EDISON ELECTRIC INSTITUTE, Washington, D.C., for Amicus Edison Electric Institute. Christopher McEachran, Raleigh, North Carolina, Matthew A. Fitzgerald, Richmond, Virginia, Todd Mullins, Noel Symons, MCGUIREWOODS LLP, Washington, D.C., for Amici Edison Electric Institute, Electric Power Supply Association, and Energy Trading Institute.

_____

WILKINSON, Circuit Judge:

The Federal Power Act (FPA) prohibits manipulation of the nation's interstate energy markets and authorizes the Federal Energy Regulatory Commission (FERC) to enforce this prohibition through civil penalties. Appellants in this case are financial trading entities and an individual trader alleged to have unlawfully manipulated a wholesale electricity market. FERC notified appellants of its intent to seek civil penalties against them; appellants denied the allegations and elected to have the case proceed via the FPA's "Alternate Option," which provides for the assessment of liability in federal district court rather than by an administrative law judge. After FERC filed the district court action, appellants moved to dismiss in part, asserting that most of the conduct underlying FERC's claim fell outside the five-year statute of limitations on civil penalty actions in 28 U.S.C. § 2462.

The question here is when FERC's claim "first accrued" with respect to this district court action, thereby starting § 2462's five-year clock. Appellants maintain that the limitations period commenced at the time of their alleged illicit trading activity. FERC asserts that its claim did not accrue until it fulfilled each of the FPA's prerequisites to filing suit in federal district court. The district court adopted the latter view and held that FERC's action was timely. We agree. Because FERC had no complete and present cause of action until each statutory prerequisite to suit was met, the statute of limitations did not run until that date. Accordingly, we hold that this action was timely filed and affirm the district court's judgment.

## I.

## A.

FERC is an independent regulatory commission comprised of five members appointed by the President and confirmed by the Senate. 42 U.S.C. § 7171(a)-(b). Pursuant to the FPA, FERC is charged with safeguarding the integrity of our nation's interstate energy markets. Specifically, Congress has "delegate[d] responsibility to FERC to regulate the interstate wholesale market for electricity—both wholesale rates and the panoply of rules and practices affecting them." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 773 (2016). At bottom, this regulatory landscape is designed to ensure that consumers pay "just and reasonable" rates for electric power. See *id.* at 773 (quoting 16 U.S.C. § 824d(a)).

As amended by the Energy Policy Act of 2005, the FPA prohibits the use of manipulative schemes in connection with the purchase or sale of electric energy. In particular, § 824v(a) of the Act, known as the Anti-Manipulation Provision, makes it unlawful for any entity "directly or indirectly, to use or employ," in connection with the purchase or sale of electric energy or transmission services subject to FERC's jurisdiction, "any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as [FERC] may prescribe as necessary or appropriate in the public interest or for the protection of electric ratepayers." 16 U.S.C. § 824v(a). FERC has promulgated rules and regulations implementing this Provision. See 18 C.F.R. § 1c.2(a). And Congress has vested FERC with the authority to enforce these rules by imposing civil penalties to the tune of up to $1 million per day per violation. 16 U.S.C. § 825*o*-1(b).

The FPA creates two procedural pathways by which such civil penalties may be assessed and imposed. 16 U.S.C. § 823b. We refer to them as the Default Option and the Alternate Option. In the main, the Default Option provides for administrative adjudication before an administrative law judge (ALJ), *id.* § 823b(d)(2), whereas the Alternate Option provides for adjudication in federal district court, *id.* § 823b(d)(3). It is up to the alleged violator to choose the track.

Both options begin with the same, statutorily prescribed first step: "Before issuing an order assessing a civil penalty against any person under this section, [FERC] shall provide to such person notice of the proposed penalty." 16 U.S.C. § 823b(d)(1). In this notice, FERC is required to inform the alleged violator of the two procedural pathways, and the subject party must then elect between them within thirty days of receiving the notice. *Id.*; *id.* § 825*o*-1(b) (directing FERC to provide "notice and opportunity for public hearing" before assessing penalties). FERC, by regulation, satisfies the notice requirement by issuing an Order to Show Cause (OSC) to the suspected wrongdoer. See 18 C.F.R. § 385.209(a)(2). The OSC describes the alleged violations and directs the recipient to demonstrate why FERC should not assess the proposed penalty. See Enforcement of Statutes, Regulations & Orders, 123 FERC ¶ 61156, 62014 (May 15, 2008). In addition, the OSC commences a "contested on-the-record proceeding" before FERC, *id.* § 385.2201(c)(1)(i), the purpose of which is to determine whether the OSC's proposed civil penalties should in fact be assessed.

The exact form that this proceeding takes is determined by the alleged violator's choice of procedural pathway. If the subject of an OSC elects the Default Option, then the

5

case proceeds to a formal adjudication before an ALJ. 16 U.S.C. § 823b(d)(2). No penalty is assessed against the regulated party until a "determination of violation has been made on the record after an opportunity for an agency hearing . . . before an administrative law judge." *Id.* § 823b(d)(2)(A). Limited judicial review of the ALJ's determination is available in the applicable court of appeals. *Id.* §§ 823b(d)(2)(B); 825*l.*

On the other hand, if, after receiving an OSC, a party elects the Alternate Option, no formal administrative hearing is statutorily required before FERC assesses a penalty. Instead, the case is channeled into an abbreviated agency proceeding, which we will call the Show Cause Process. In this context, the FPA mandates that FERC "shall promptly assess" a penalty "by order." 16 U.S.C. § 823b(d)(3)(A). Then, if the violator does not pay the amount set forth in this penalty assessment order (PAO) in full within 60 calendar days, FERC must "institute an action in the appropriate district court of the United States for an order affirming the assessment of the civil penalty." *Id.* § 823b(d)(3)(B). In such an action, the district "court shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part, such assessment." *Id.*

Finally, upon the district court's final judgment, or after a final administrative order under the Default Option, FERC must file an action in federal district court "to recover" any civil penalty that remains unpaid. 16 U.S.C. § 823b(d)(5).

Because the FPA does not contain a statute of limitations, the general statute of limitations applicable to many penalty provisions throughout the U.S. Code applies to actions brought under both the Default and Alternate Options. It provides:

6

Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

## B.

Appellants are Dr. Houlian Chen and various financial entities either owned by Dr. Chen or on whose behalf he has executed trades in the wholesale electricity market. In September 2007, Dr. Chen began trading on a wholesale electricity market administered by PJM Interconnection, LLC (the PJM Market). In August 2010, FERC began investigating after receiving two independent complaints that appellants were engaging in fraudulent and unlawful trading on the PJM Market.

After an extensive investigation and the failure of settlement efforts, FERC issued an OSC to appellants on December 7, 2014, alleging that they had violated the Anti-Manipulation Provision and its implementing regulations. J.A. 184-275. Appellants denied the charges and elected to proceed via the Alternate Option. On May 29, 2015, FERC duly issued a PAO, which sought over $29 million in civil penalties and $4 million in disgorgement, on the grounds that appellants had violated § 824v(a) "through a scheme to engage in fraudulent Up-To Congestion (UTC) transactions in [PJM's] energy markets to garner excessive amounts of certain credit payments to transmission customers." J.A. 92. Appellants failed to pay the assessed penalties within sixty days, so on July 31, 2015, FERC filed a complaint in the United States District Court for the Eastern District of Virginia seeking an order affirming the assessment of civil penalties.

7

On February 28, 2018, appellants filed a motion to partially dismiss the complaint. As is relevant here, they argued that the bulk of the allegedly fraudulent conduct giving rise to FERC's claim was no longer actionable under § 2462's five-year statute of limitations. This because, according to appellants, FERC's claim "accrued" for purposes of the statute of limitations at the time of the conduct at issue, and only FERC's filing of the district court action qualified as an "action, suit[,] or proceeding" within the meaning of § 2462. Appellants conducted their last purportedly manipulative trades on August 3, 2010, but FERC did not file its complaint until July 31, 2015, precluding enforcement of civil penalties against all but four days of appellants' trading activities.

FERC opposed the motion to dismiss. It principally argued that, where the subject of an enforcement proceeding elects the Alternate Option, FERC's claim does not "accrue," for purposes of filing suit in federal district court, until the subject fails to pay the assessed penalties within sixty days of the PAO. Since FERC filed suit within five years of that date in the instant case, it maintained that the entirety of its case was timely.

The district court denied appellants' motion to dismiss on September 24, 2018. Agreeing with FERC, it held that FERC's claim "accrued" under § 2462 only after appellants received the PAO and sixty days elapsed without their making payment. This was so, according to the district judge, because FERC had "no right to commence any action in a district court" until that time. *FERC v. Powhatan Energy Fund, LLC*, 345 F. Supp. 3d 682, 695 (E.D. Va. 2018).

Simultaneous with its denial of appellants' motion to dismiss, the district court certified its ruling for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Appellants

8

filed a petition for permission to appeal, which this court granted on November 5, 2018.

## II.

## A.

At the heart of this case is the meaning of 28 U.S.C. § 2462—specifically, when a claim has "first accrued"—as applied to the enforcement scheme Congress set out in the FPA's Alternate Option. Appellants argue that a claim for violation of the Anti-Manipulation Provision accrues at the time of the predicate violation of law, such that, under the Alternate Option, FERC must commence the district court action within five years of that unlawful conduct. Application of this view here would exclude all but the final four days of appellants' trading activities from the five-year limitations period. For its part, FERC contends that, under the Alternate Option, such a claim does not accrue until FERC satisfies each of the FPA's statutory prerequisites to filing suit in federal district court. Under FERC's interpretation, all the disputed conduct would fall within the limitations period.

The proper construction and application of a statute of limitations is a question of law we review de novo. *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002). Because we confront a case in which a private party raises a statute of limitations to bar a government action, we are obliged to apply a "strict construction in favor of the government." *E.I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924). In keeping with this injunction, we are mindful of "the hazards inherent in attempting to define for all purposes when a 'cause of action' first 'accrues.'" *Crown Coat Front Co. v. United States*, 386 U.S. 503, 517 (1967). Rather, "[s]uch words are to be interpreted in the light of the general

9

purposes of the statute and of its other provisions, and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought." *Id.* (internal quotation marks and citation omitted).

B.

With these background principles in mind, we turn to the merits of appellants' challenge. In applying the statute of limitations in § 2462 to the FPA's Alternate Option, we must (1) identify what constitutes an "action, suit[,] or proceeding for the enforcement of any civil fine, penalty, or forfeiture," and (2) decide when FERC's "claim first accrued" for purposes of filing that "action, suit[,] or proceeding." 28 U.S.C. § 2462.

On the first matter, appellants agree that FERC commenced "an action, suit[,] or proceeding" within the meaning of § 2462 by filing its complaint in the district court. Because the aim of that proceeding was to impose and ultimately enable collection of a civil penalty, FERC plainly was seeking "the enforcement of any civil fine, penalty, or forfeiture" against appellants. See *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 669 (4th Cir. 1997) (holding that, within the context of § 2462, "'enforcement' could be read to mean 'imposition'" (quoting *3M Co. v. Browner*, 17 F.3d 1453, 1458 (D.C. Cir. 1994))).

As to when FERC's claim "first accrued" for purposes of filing the district court action, appellants argue that the statute of limitations in § 2462 ran from the dates of their alleged violations of the Anti-Manipulation Provision. On their telling, this conclusion follows from the "well-established principle that limitations periods begin at the time of the conduct in dispute." Appellants' Op. Br. 16. In support of this proposition, they note that limitations periods in many statutes have been interpreted to run from the time of the

10

disputed conduct, and, more specifically, that the Supreme Court has held that a civil penalty claim for fraud under the Investment Advisers Act "accrues—and the five-year clock [of § 2462] begins to tick—when a defendant's allegedly fraudulent conduct occurs." *Id.* at 15 (quoting *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)).

Although appellants are correct that there are many instances in which a claim accrues instantly upon a statutory violation, no natural law principle dictates that result. Statutes of limitation are, as the name implies, statutory. And as creatures of congressional intent, their application to a given cause of action must take account of any substantive prerequisites that Congress has placed on the right to file the underlying lawsuit. Put plainly, until a prospective plaintiff satisfies any such prerequisites and has a legal right to initiate an action to enforce a claim, that claim has not "accrued."

Time and again, the Supreme Court has reiterated this basic principle: "[A] claim accrues when the plaintiff has a complete and present cause of action." *Gabelli*, 568 U.S. at 448 (internal quotation marks and citation omitted). This occurs "when 'the plaintiff can file suit and obtain relief.'" *Wallace v. Kato*, 549 U.S. 384, 388 (2007) (quoting *Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)); accord *Clark v. Iowa City*, 87 U.S. 583, 589 (1874) ("All statutes of limitation begin to run when the right of action is complete . . ."); *Evans v. Gee*, 36 U.S. 80, 84 (1837) (concluding that an action was not time barred because limitations period did not run until legal liability had attached); *Montgomery v. Hernandez*, 25 U.S. 129, 134 (1827) (holding that the statute of limitations did not run until plaintiff had "right to demand of the marshal the proceeds of the sales, or to sue for the recovery thereof").

11

As the Supreme Court recognized in *Gabelli*, this rule—that statutes of limitation do not run until a plaintiff has a complete and present cause of action—"has governed since the 1830s when the predecessor to § 2462 was enacted." 568 U.S. at 448. This is wholly unsurprising, as it is consistent with the most straightforward reading of "accrual." That is, "[i]n common parlance a right accrues when it comes into existence," *United States v. Lindsay*, 346 U.S. 568, 569 (1954), which is as true today as it was in the 19th century. See, *e.g.*, 1 A. Burrill, A Law Dictionary and Glossary 17 (1850) ("an action *accrues* when the plaintiff has a right to commence it"); Black's Law Dictionary 23 (9th ed. 2009) (defining "accrue" as "[t]o come into existence as an enforceable claim or right"). In line with these settled principles, the district court properly concluded that, "based on the plain meaning" of the term, "accrual occurs 'when the factual and legal prerequisites for filing suit are in place.'" *FERC v. Powhatan Energy Fund, LLC*, 345 F. Supp. 3d 682, 711 (E.D. Va. 2018) (quoting *3M Co.*, 17 F.3d at 1460).

That these circumstances often occur at the moment of the violation does not imply that they invariably will or that every claim must accrue at that time. *Crown Coat* is instructive on this point. There, the Supreme Court held that a contractual variance claim against the government "first accrued," under the applicable statute of limitations, upon the conclusion of administrative proceedings rather than at the time of the contract's completion. *Crown Coat*, 386 U.S. at 510, 514. This because the language of the contract and the governing statutory landscape made clear that the plaintiff had no "right to demand payment" in federal court until final administrative action. *Id.* at 511-14 (citation omitted). To be sure, unlike in the instant appeal, the plaintiff in *Crown Coat* was a private party

12

suing the government, but that in no way diminishes the Supreme Court's basic holding that "congressional purpose" governs the determination of when a right to sue comes into existence. See *id.* at 513-14.

In this case, Congress plainly conditioned FERC's right to bring an action in federal district court on the occurrence of a number of statutorily-mandated events. As the district court recognized, under the Alternate Option, FERC had no authority to file suit until it (1) provided appellants with "notice of the proposed penalty," including the opportunity to select between the Default and Alternate Options, 16 U.S.C. § 823b(d)(1); see also *id.* § 825o-1(b); (2) "promptly" issued a PAO after appellants selected the Alternate Option, *id.* § 823b(d)(3)(A); and (3) stood by for 60 calendar days of appellants' nonpayment of the penalty, *id.* § 823b(d)(3)(B). Only upon satisfaction of these requirements did Congress direct that FERC "shall institute an action" in federal district court. *Id.* And only then did § 2462's statutory limitations period for filing suit commence.

The FPA's statutory prerequisites to filing suit set this case apart from *Gabelli*. The statute at issue there permitted the Securities and Exchange Commission to proceed directly to district court for a penalty assessment. 15 U.S.C. § 80b-9(e)(1) ("Whenever it shall appear to the [SEC] that any person has violated any provision of this subchapter . . . the [SEC] may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation."). But here, FERC could not proceed to district court until it had issued a PAO and 60 days had passed. 16 U.S.C. § 823b(d)(3).

As a result, *Gabelli* did not, as appellants contend, adopt an "unconditional ruling

that government claims for civil penalties must face a fixed expiration date, five years from when the disputed conduct occurred." Appellants' Op. Br. 19. The Court merely asked whether, in the context of SEC actions for civil penalties, "the five-year clock [of § 2462] begins to tick when the fraud is complete or when the fraud is discovered" and decided against applying the fraud discovery rule. *Gabelli*, 568 U.S. at 444-45, 454. Put otherwise, the SEC had a complete and present cause of action at the time of the disputed conduct. FERC did not; under the Alternate Option, Congress prohibited FERC from filing suit in district court until it satisfied each statutory prerequisite. See *FERC v. Silkman (Silkman I)*, 177 F. Supp. 3d 683, 699 (D. Mass. 2016) (noting that *Gabelli* was "a case about discovery rules" with little bearing on the need to comply with statutory prerequisites in order for a claim to "accrue" under § 2462).

Appellants try to downplay the significance of the constraints set by Congress in the FPA. They first assert that the "minimal statutory procedural prerequisites that existed could have been met easily and promptly," and second, that Congress could not have intended the statute of limitations to run only after the completion of procedures subject to FERC's exclusive control. Appellants' Op. Br. 18. This argument errs twice over.

To start, the procedures mandated under the Alternate Option are extensive, not "minimal." In order to apprise the regulated party of the nature of its transgressions, FERC conducts thorough investigations of complex, potentially fraudulent financial transactions. FERC is then obligated to provide a suspected violator "notice of the proposed penalty," along with a description of and opportunity to elect between the Default and Alternate Options. 16 U.S.C. § 823b(d)(1); see also *id.* § 825*o*-1(b). Upon the recipient's selection

14

of the Alternate Option, FERC is required to commence the Show Cause Process and "promptly" issue a PAO. *Id.* § 823b(d)(3)(A). And in so doing FERC must "take into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a timely manner." *Id.* § 825*o*-1(b).

Put otherwise, the agency action mandated by the Alternate Option contemplates extensive factfinding and the application of law to fact. The process afforded appellants in this case is on all fours with that general observation. By way of the OSC, appellants received notice of the charges against them, including the detailed factual allegations giving rise to FERC's claim that they had engaged in sophisticated manipulation of the PJM Market. After providing numerous opportunities to respond to these allegations, FERC issued a 90-page PAO concluding that appellants' "serious[]" violations warranted the assessment of substantial penalties. See J.A. 90-179. FERC then, as statutorily mandated, waited at least 60 days before filing the instant district court action. In short, the procedures set out by Congress, and as applied by FERC, are far from de minimis or "easily" satisfied.

As for appellants' objection to FERC's control over the timing of this process, it also misses the mark. The compendium of statutory requirements that FERC must comply with is firmly rooted in the text of the FPA. Further, the authority to implement these requirements is congressionally delegated. In addition to Congress's general conferral of authority on FERC to make "such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of [the Federal Power Act]," 16 U.S.C. § 825h, the FPA expressly authorizes FERC to promulgate rules of practice and procedure governing

15

"all hearings, investigations, and proceedings" under the Act, *id.* § 825g(b).

For good reason: Congress structured the FPA so as to afford FERC latitude in determining whether the statute's highly technical rules have been violated and, in the event of a violation, in assessing a penalty reflective of the harms that market manipulation visits on consumers. See *PPL EnergyPlus, LLC v. Nazarian*, 735 F.3d 467, 473 (4th Cir. 2014) ("The federal [wholesale electricity] markets are the product of a finely-wrought scheme that attempts to achieve a variety of different aims"). In essence, the degree to which FERC controls the pace of proceedings—and therefore when a complete and present cause of action accrues—is a matter of congressional design. And because, to reiterate, the general statute of limitations in § 2462 must be evaluated and applied in the context of the statutory scheme at issue, see *Crown Coat*, 386 U.S. at 517, we must give effect to the congressional purposes undergirding the FPA.

To adopt appellants' position that FERC has only five years from the date of the underlying violation both to complete the entire Show Cause Process and to institute the district court action would materially disrupt this carefully reticulated enforcement scheme. Appellants' view would, in effect, put a suspected violator in control of the enforcement timeline and give it "considerable incentive to employ the available procedures to work delay." *United States v. Meyer*, 808 F.2d 912, 919 (1st Cir. 1987). The procedures here lend themselves to that perverse result, owing to the complexity of the subject matter and proceedings under FERC's charge. Yet, as the First Circuit noted with respect to complex administrative litigation, "it strikes us as implausible that Congress intended to endow private litigants with so powerful an incentive for procrastination." *Id.* at 920.

16

At any rate, forcing FERC to proceed on such an expedited basis would inhere to the detriment of market participants like appellants. For it would risk the imposition of civil penalties based on potentially slipshod investigations, hastily undertaken to protect against the effect of a premature limitations period. In this sense, ensuring that FERC has enough time to thoroughly vet each alleged instance of market manipulation before filing suit can be, in actuality, of benefit to the regulated party.

In light of the above, it is plain that FERC's claim did not accrue under § 2462, for purposes of filing the district court action, until it had issued the PAO and appellants refused to pay the assessed penalties for 60 days.

## III.

Appellants complain that applying the well-established meaning of "accrued" in this context would "allow[] civil penalties under the FPA to be brought at any distance of time, leaving people and companies forever liable to a pecuniary forfeiture." Appellants' Op. Br. 2-3 (internal quotation marks and citations omitted). This, however, is incorrect. Far from creating an "infinite" statute of limitations, the FPA affirmatively obligates FERC to commence and prosecute actions for violations of the Anti-Manipulation Provision within a circumscribed timeframe.

## A.

To begin with, it is clear that FERC must issue the statutorily required notice of proposed penalty, which it does by issuing an Order to Show Cause (OSC), within five years of the allegedly unlawful conduct giving rise to the claim. It bears reiterating here that FERC's issuing the OSC is not the same as its filing a lawsuit to enforce civil penalties

17

in federal district court. See supra Part I.A. Rather, what the OSC does, in addition to fulfilling the statutory notice requirement, is commence administrative proceedings that may culminate in the assessment of civil penalties. *Id.* The text of the FPA, the relevant regulations, and the structure of the overall enforcement scheme all compel the conclusion that FERC must issue the OSC and commence its administrative process within five years of the alleged misconduct. And while this is equally true regardless of whether the suspected wrongdoer elects the Default or Alternate Option, we focus our analysis on the Alternate Option as selected by appellants.

All parties agree that if FERC's Show Cause Process is a "proceeding" within the meaning of § 2462, then FERC is required to commence that Process within five years of the underlying conduct. See Appellants' Reply Br. 15-16; Appellee's Br. 38-39; see also *3M Co. v. Browner*, 17 F.3d 1453, 1455-58 (D.C. Cir. 1994) (holding that civil penalty cases brought before agencies can qualify as "proceedings" under § 2462). As we have noted, the Show Cause Process consists of the agency penalty assessment procedures that are invoked when the subject of an OSC elects the Alternate Option. Appellants insist that the Show Cause Process amounts to nothing more than a prosecutorial decision to bring suit, which typically does not qualify as a "proceeding" for the purposes of § 2462. See *3M Co.*, 17 F.3d at 1459 n.11 (noting that the term "proceeding" in § 2462 "implicate[s] some adversarial adjudication" (quotation omitted)); *United States v. Meyer*, 808 F.2d 912, 920-21 (1st Cir. 1987). The courts to have considered this question uniformly agree that FERC undertakes *some* determination of liability during the Show Cause Process. *FERC v. City Power Mktg., LLC*, 199 F. Supp. 3d 218, 232 (D.D.C. 2016) ("There is no escaping

18

the fact that under [the Alternate Option] FERC must first determine at the agency level whether to assess the penalty."). They have split, however, over whether that determination is the result of a § 2462 "proceeding," see, *e.g.*, *FERC v. Silkman (Silkman I)*, 177 F. Supp. 3d 683, 700 (D. Mass. 2016), or is a mere prosecutorial decision, see, *e.g.*, *FERC v. Barclays Bank PLC*, No. 2:13-cv-02093, 2017 WL 4340258, at *12-14 (E.D. Cal. Sept. 29, 2017).

To begin, § 2462 does not define the term "proceeding," and proceedings themselves vary in their procedures. On balance, the procedures mandated by FERC's Show Cause Process more closely resemble an adjudicative "proceeding" than a prosecutor's charging decision. See *FERC v. Silkman (Silkman II)*, 359 F. Supp. 3d 66, 121 (D. Me. 2019) (concluding that the Show Cause Process is "closer to [an ALJ hearing] than to a prosecutorial determination or charging letter"); see also *3M Co.*, 17 F.3d at 1459 ("Because [administrative] assessment proceedings . . . seek to impose civil penalties, they are proceedings for the 'enforcement' of penalties and § 2462 thus applies."); *Arch Mineral Corp. v. Babbitt*, 104 F.3d 660, 670-71 (4th Cir. 1997) (approving *3M Co.*).

While the Show Cause Process does not contain all the hallmarks of a formal judicial or administrative adjudication, see *Barclays Bank PLC*, 2017 WL 4340258, at *12-14, it does share many crucial similarities. For one, the Show Cause Process is a "contested on-the-record proceeding" before FERC, not simply a unilateral prosecutorial decision. 18 C.F.R. § 385.2201(c)(1)(i). In this proceeding, which is governed by FERC's Rules of Practice and Procedure, the FERC Commissioners act as neutral decisionmakers, while FERC Enforcement staff present the factual and legal bases supporting imposition of a civil

penalty. *Id.* §§ 385.2201, 2202. Upon commencement of the Show Cause Process, FERC's ex-parte communications rule applies, prohibiting "any off-the-record communications between (i) Commissioners and the staff that may advise them (decisional staff) and (ii) Enforcement prosecutorial staff involved in the investigation or show cause proceeding." *Silkman II*, 359 F. Supp. 3d at 99 (citing 18 C.F.R. § 385.2201(c)(1)(i)). The two sides submit formal briefing and relevant documentary evidence to FERC, *id.* at 100, 106, which then determines whether to impose civil penalties. Simply put, it is difficult to characterize this adjudicatory process as merely a discretionary decision to prosecute.[1]

But even if the Show Cause Process were somehow not deemed a "proceeding," FERC must nonetheless issue the OSC within five years of the unlawful conduct. That conclusion is compelled by the structure of the statutory scheme itself. It is undisputed that with respect to the Default Option FERC must commence the requisite ALJ adjudication within five years of the alleged violation for that action to be timely under § 2462. See Oral Argument at 27:59, *FERC v. Powhatan Energy Fund, LLC* (No. 18-2326). This makes perfect sense. There is no question that, after issuance of the OSC, if the party elects the Default Option, then a § 2462 "proceeding" before an ALJ must take place. See *3M Co.*, 17 F.3d at 1455-59, 1462 (holding that ALJ hearings to assess civil penalties are in

---

[1] Appellants maintain that the Show Cause Process cannot be considered a proceeding for § 2462 purposes because it is "an agency invention that has no statutory basis" as it is wholly self-imposed by FERC via regulation. Appellants' Op. Br. 36. We disagree. For starters, this statement is inaccurate. The Show Cause Process effectuates the FPA's command that FERC provide notice and a prompt penalty assessment to offending parties. See 16 U.S.C. §823b(d). In any event, that an agency proceeding is largely a creature of regulation rather than statute does not preclude it from qualifying as a "proceeding" for the purposes of § 2462. See *3M Co.*, 17 F.3d at 1456.

general "proceedings" under § 2462 that must be commenced within five years of the wrongful conduct). That being the case, the OSC must necessarily be issued within five years of the unlawful conduct to satisfy § 2462.

Because FERC cannot know in advance which option—Default or Alternate—the party receiving the OSC will select, it must issue the OSC within five years of the unlawful conduct across the board. This is because, if FERC were to issue an OSC more than five years after the fraudulent conduct, an alleged violator could simply elect the Default Option and cause FERC's claim to be barred by the statute of limitations, as FERC would be unable to commence an ALJ "proceeding" within the requisite time period. As such, in order to head off such a limitations bar, the FPA's enforcement scheme affirmatively requires FERC to issue an OSC within five years of a suspected violation, regardless of which procedural option the defendant eventually elects. Indeed, FERC acknowledged as much at oral argument. See Oral Argument at 32:10 ("From the time of misconduct, the agency has five years to start the process by issuing an Order to Show Cause to assess a penalty."). This is unsurprising, as it would add an unnecessary layer of confusion for different timelines to apply to the Default and Alternate Options.

B.

Likewise, after FERC has issued an OSC, the FPA makes clear that FERC is on the clock again—specifically, it must proceed with dispatch in conducting the Show Cause Process, assessing any penalty, and issuing the PAO. Section 823b of the FPA provides that, once an alleged violator has elected the Alternate Option, FERC "shall promptly assess [a] penalty, by order." 16 U.S.C. § 823b(d)(3)(A). While it is true that the FPA

21

does not define the crucial term "promptly," the plain meaning of that word precludes the possibility of endless delay. See Oxford English Dictionary (3d ed. 2007) (defining "promptly" as "[i]n a prompt manner; readily, quickly; at once, without delay; directly, forthwith, there and then").

Furthermore, the statutory requirement that FERC promptly assess a penalty is not merely precatory. On the contrary, the Administrative Procedure Act "imposes a general but nondiscretionary duty upon an administrative agency to pass upon a matter presented to it 'within a reasonable time,' 5 U.S.C. § 555(b), and authorizes a reviewing court to 'compel agency action unlawfully withheld or unreasonably delayed,' *id.* § 706(1)." *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1099 (D.C. Cir. 2003). Where an agency "fails[s] to take a *discrete* agency action that it is *required to take*," the APA creates a private cause of action for a party aggrieved by that agency's unreasonable delay to compel such action. *Norton v. SUWA*, 542 U.S. 55, 64 (2004); see also *TRAC v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984) (listing factors relevant to determining whether agency action has been unreasonably delayed).

There is no doubt that the FPA's mandate that FERC "*shall* promptly assess" a penalty is an action that FERC is required to take. See *Kingdomware Techs., Inc., v. United States*, 136 S. Ct. 1969, 1977 (2016) ("Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement."). Thus, at a minimum, if FERC were to disregard this statutory command, a party facing a potential penalty assessment could bring suit under the APA to force FERC to issue a PAO in a timely manner. See *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (noting that a reasonable time

22

for agency action is usually "counted in weeks or months, not years"). Requiring an APA suit to force agency action is no small imposition, but at least the option is there.[2]

The process of investigation and subsequent enforcement is a complex and technical one, which cannot be completed in an afternoon. The FPA envisions a process which is responsive to the complicated nature of the activities the statute regulates, namely "the actions of sophisticated traders in complex markets," Appellee's Br. 20, that necessarily require time to assess. At the same time, the FPA creates a clear and temporally bound three-step process for enforcing violations of the Anti-Manipulation Provision via the Alternate Option. First, as prescribed by § 2462, FERC has five years from the date of the commission of the unlawful conduct to investigate an alleged violation and issue a notice of proposed penalty, which it does through an OSC. Once such notice has been issued and the purported wrongdoer has elected the Alternate Option, FERC must "promptly assess" a penalty, 16 U.S.C. § 823b(d)(3)(A), a statutory mandate that can be enforced in court via the APA. And once FERC has issued a PAO and the defendant has failed to pay the assessed penalty within 60 days, FERC's claim has accrued and the time begins in which it must commence an action in federal district court. See supra Part II. We simply cannot

---

[2] What's more, compelling FERC to issue a PAO may not be the only avenue of relief for defendants faced with inordinate delay in the Show Cause Process. One of our sister circuits has held that the APA authorizes federal courts to "dismiss agency action unreasonably delayed" if such delay "results in serious prejudice to one of the parties." *Houseton v. Nimmo*, 670 F.2d 1375, 1377-78 (9th Cir. 1982). But we need not pass on whether this defense is available other than to note that unreasonable delay can put the agency's case at risk.

endorse the view that this carefully wrought scheme "transform[s] § 2462 into a statute of *no* limitations." Appellants' Op. Br. 11.

## C.

That is not all. We are not prepared to assume that FERC is determined to delay the expeditious prosecution of energy market manipulation that is essential to fulfilling its statutory mandate. As previously discussed, the "FPA delegates responsibility to FERC to regulate the interstate wholesale market for electricity," *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 773 (2016), and to ensure that all rates charged in that market are "just and reasonable," *id.* (quoting 16 U.S.C. § 824d(a)). Given the tangible harms visited on consumers by fraudulent conduct in the energy markets, Congress realized that tasking FERC with monitoring those markets "is not enough—FERC must have the tools to act when markets fail, and it must use those tools to ensure that customers pay only just and reasonable rates." *Mont. Consumer Counsel v. FERC*, 659 F.3d 910, 920 n.5 (9th Cir. 2011). We are mindful that bureaucratic lassitude and lack of resources too often slow agency actions, but we are not so jaded as to believe that FERC is incentivized to be dilatory in pursuing violations that so closely bear on its primary statutory duty to protect the public. See *Elec. Power Supply Ass'n*, 136 S. Ct. at 773 ("[I]f FERC sees a violation of [the just and reasonable rates] standard, it *must* take remedial action.") (emphasis added).

This is especially true in cases where, as here, "footdragging would tend to reduce the [agency's] chances of proving its case and collecting monetary sanctions." *Meyer*, 808 F.2d at 922. In particular, the FPA requires FERC to "take into consideration the seriousness of the violation and the efforts of such person to remedy the violation in a

24

timely manner" when determining the amount of civil penalties. 16 U.S.C. § 825*o*-1(b). Undertaking such a fact intensive and temporally contingent analysis grows more difficult with each day that passes from the occurrence of the underlying violations, giving FERC added incentive to avoid deleterious delay.

The statutory scheme we have outlined here is cognizant of two realities: (1) the violations at issue take time to investigate and to uncover and (2) the case must unfold in a manner that is respectful of the rights of the alleged violators. The legal process herein gives FERC time to develop the case but also affords the assurance that the alleged violator will be apprised through the OSC and the PAO as to what FERC is doing.

We doubt that the law as written has interminability as a drawback. Indeed, it would make no sense for FERC to go to the considerable trouble of working up a complex case, assessing a penalty for fraudulent market activities, observing the period for payment of the penalty pass, and then delaying filing suit in district court to affirm the penalty assessment. So much is apparent from the instant case. FERC issued a PAO to appellants on May 29, 2015. Then, on July 31, 2015—just three days after the expiration of the 60-day waiting period—FERC filed its complaint in the district court. Such prompt action in enforcing civil penalties is to be expected, as it represents the natural culmination of significant investigative efforts on the part of the agency.

IV.

For the foregoing reasons, we hold that FERC did not have a complete and present cause of action to file suit in federal district court until 60 days elapsed after it had issued the PAO and appellants refused to pay the assessed penalty. See 16 U.S.C § 823b(d)(3)(B).

25

As such, FERC's claim had not "accrued" until that point, so this action was timely filed. See 28 U.S.C. § 2462. Accordingly, we shall affirm the holding of the district court and remand for further proceedings.

AFFIRMED AND REMANDED