**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1711**

———————

U.S. SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff − Appellee,

        v.

MARK JOHNSON,

                Defendant – Appellant,

        and

THE OWINGS GROUP, LLC; OWINGS-1, LLC; OWINGS CAPITAL GROUP, LLC; OWINGS CAPITAL FUNDS, LLC; KEVIN DROST; BRIAN KOSLOW; DAVID WALTZER; MJSC ENTERPRISES LLC; ONE SOURCE ADVISORS, LLC; STRATEGIC COACHING, INC.,

                Defendants.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:18−cv−02046−RDB)

———————

Argued:  May 4, 2022                          Decided:  August 4, 2022

———————

Before NIEMEYER and DIAZ, Circuit Judges, and FLOYD, Senior Circuit Judge.

———————

Affirmed by published opinion.  Judge Diaz wrote the opinion, in which Judge Niemeyer and Senior Judge Floyd joined.

———————

**ARGUED:** William Stuart Heyman, HEYMAN LAW FIRM, Baltimore, Maryland, for Appellant. Daniel Staroselsky, UNITED STATES SECURITIES & EXCHANGE COMMISSION, Washington, D.C., for Appellee. **ON BRIEF:** Michael A. Conley, Acting General Counsel, John W. Avery, Deputy Solicitor, UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Washington, D.C., for Appellee.

———————

DIAZ, Circuit Judge:

Mark Johnson challenges the district court's disgorgement order against him and Owings Group, LLC, the entity he founded and controlled. Together, Johnson, Owings, and three codefendants perpetrated a fraudulent scheme in violation of federal securities laws. After Johnson consented to an entry of judgment, the court ordered him to disgorge $681,554, and imposed a monetary penalty in the same amount.

Johnson argues that the disgorgement order violates *Liu v. SEC*, 140 S. Ct. 1936 (2020), and that the district court erroneously premised the associated monetary penalty on joint-and-several liability. Because Johnson only individually pocketed $156,963 of the scheme's ill-gotten gains, he maintains that, under *Liu*, he shouldn't have to disgorge the $524,591 attributable to Owings. But Johnson misreads *Liu*, so we affirm the district court's disgorgement order and its monetary penalty.

I.

A.

Johnson is a repeat securities offender, having been convicted of securities fraud and conspiracy to commit securities fraud in 2010. The parallel civil investigation of that conspiracy was ongoing when Johnson began the scheme here. After the Securities and Exchange Commission ("SEC") sued him and others, Johnson consented to an entry of judgment in the case before us.

3

The consent judgment precluded him from challenging the allegations in the Commission's complaint in any motion for monetary remedies (including disgorgement and civil penalties).  We thus take the complaint's allegations as true.

B.

Johnson was the "mastermind and architect" of an investment program that touted a streamlined method for taking small-to-medium-sized companies public.  J.A. 26. Through Owings, Johnson and his salespeople—Kevin Drost, Brian Koslow, and David Waltzer (now codefendants)—used fraudulent means to solicit investors for the program.

The investors paid Owings $60,000 as a "joint venture partnership" to navigate the Form S-1 registration process.[1]  J.A. 22.  Once the companies went public, their "stock[s] could be publicly traded"—a potential benefit to the investors.  J.A. 22.  Owings would then (in theory) be compensated with shares of the newly public companies.

But Owings "misrepresented to [those] investors" its "track record with this 'streamlined' approach."  J.A. 16.  Though it "had only an untested idea and an inexperienced team," Owings "create[d] the false impression that [it] had been successfully using its 'streamlined' approach for years."  J.A. 16.  In fact, Owings had never brought a single company public through the program or by any other means.

Johnson's and Owings's misrepresentations didn't stop there.  Investors were assured, for example, that they would receive a 100% return in six to eight months.

---

[1] The Form S-1 must be "file[d] with the [SEC] to register [] securities prior to listing them on a public exchange."  J.A. 22.  Owings and Johnson also represented that they would handle all other necessary filings to take the companies public.

Johnson later reduced "the represented return from 100% to 50%" so that potential investors wouldn't "question whether the investment was 'too good to be true.'" J.A. 35. But whether 100% or 50%, the figure "had no basis in fact," and Johnson made the change only to make his deception more credible. J.A. 30.

With the "clock ticking on the [return] timeline," "Owings and Johnson created four shell companies to be brought public through the [program] to give the false impression" that it worked. J.A. 36. Owings and Johnson never told investors that these were shell companies or that their attempt to register the companies for public trading triggered a separate SEC investigation. What's more, the only Form S-1 that Owings ever filed wasn't on behalf of any of its investors; rather, it sought to register the shell companies.

Owings and Johnson also created fake escrow accounts that purportedly "held publicly-traded stock as collateral for each $60,000 investment" made by investors. J.A. 28. These accounts, however, were "largely a fabrication to deceive investors into believing their investments in the [program] were secure." J.A. 34.

Further, Owings and Johnson made "false and misleading statements in investor presentations, PowerPoint slideshows, and e-mails to investors." J.A. 28. And they "falsely represented" to their investors "how [the] investor proceeds would be used." J.A. 32. While Johnson "personally solicited" Owings's investors, he avoided using his own name in the marketing materials to conceal his criminal history, and never disclosed that he wasn't a registered securities broker or dealer. J.A. 26, 28.

Owings and Johnson perpetrated this scheme for over two years before it collapsed, defrauding nearly fifty investors out of about $4 million. Though Owings repaid some

5

"disgruntled early investors" using new investors' money in Ponzi-like fashion, the company spent the remaining money. J.A. 38–39. Johnson and his salespeople pooled those proceeds in Owings's bank accounts and "then transferred [the funds] to accounts Johnson owned or controlled . . . for his personal benefit." J.A. 22–23, 26.

Throughout the scheme, Johnson was Owings's Chief Executive Manager and controlling member. As such, he managed the company's bank accounts, "ma[de] decisions on behalf of the company," and "develop[ed] and implement[ed] company policies." J.A. 19.

## C.

The SEC sued Johnson (and his salespeople), as well as Owings (and its related entities). The individual defendants each consented to an entry of judgment.[2] The judgments left it to the district court to determine (upon the SEC's motion) whether—and if so, in what amount—to order disgorgement and a civil penalty. The SEC's certified public accountant found that (1) Johnson deposited $156,963 from the scheme into his personal bank accounts and (2) Owings received about $4,435,880 from the scheme, of which $524,591 went to illegitimate purposes.

The SEC moved for monetary remedies against Johnson and his codefendants under Section 21(d)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(5). The Exchange Act provides that, in any SEC enforcement action, "the Commission may seek,

---

[2] The district court also entered default judgments against the entity defendants.

6

and any Federal court may grant, any equitable relief that may be appropriate or necessary for the benefit of its investors." 15 U.S.C. § 78u(d)(5).[3]

While the SEC's motion was pending, the Supreme Court decided *Liu v. SEC*, 140 S. Ct. 1936 (2020). *Liu* considered a district court's authority to impose equitable remedies (like disgorgement) in SEC enforcement actions and the propriety of joint-and-several liability in such cases.

In broad strokes, the Court found that the SEC had to exclude legitimate business expenses from its disgorgement calculation but that disgorgement remained an avenue for equitable relief. *Id.* at 1940. And without deciding the scope of joint-and-several liability in disgorgement orders, the Court said that such liability may be permissible for "partners engaged in concerted wrongdoing," when limited to those partners' net profits. *See id.* at 1949.

Following *Liu*, the SEC sought a reduced disgorgement amount against Johnson and Owings.[4] But the SEC maintained that Johnson, as Owings's control person, should still be jointly and severally liable for the company's ill-gotten gains. So against Johnson, the SEC requested disgorgement of $681,554 (reduced from $2,213,368 pre-*Liu*) plus

---

[3] Congress amended 15 U.S.C. § 78u in 2021 to add subsection (d)(7), which authorizes federal courts to order disgorgement in cases brought by the Commission. But the district court ordered disgorgement using its equitable power under subsection (d)(5). Thus, we needn't interpret subsection (d)(7) to resolve this case.

[4] The SEC suggested that the other individual defendants disgorge the sum each received through the scheme. But after *Liu*, the SEC no longer sought disgorgement against the other Owings entities or a civil penalty against any entity defendant, including Owings.

$117,540.47 in prejudgment interest. Of that amount, $524,591 in disgorgement and $90,470.71 in interest were joint-and-several with Owings.

The SEC also asked the court to impose civil penalties against the individual defendants in the amount of their gross pecuniary gain. For Johnson then, the SEC requested a $3.178 million penalty—the gross investor proceeds that Owings received during the five-year limitations period. For the other individual defendants, the SEC sought penalties equal to its disgorgement requests.

## D.

The district court held a hearing to address the SEC's motion for disgorgement and civil penalties. Johnson argued that disgorgement isn't a punitive sanction and thus should be restricted to an individual wrongdoer's net profits. And there was no dispute, even by the SEC's calculations, about how the ill-gotten gains were apportioned—$156,963 to Johnson and $524,591 to Owings.

Johnson also contended that the few "factors" the Supreme Court enumerated in *Liu* for joint-and-several disgorgement didn't support that remedy here. J.A. 165. There was no evidence, for instance, that Johnson "was receiving and commingling all the money that went into [] Owings." *Id.*

The district court disagreed. It found that (1) *Liu* didn't foreclose ordering joint-and-several disgorgement, and (2) disgorgement on such a basis was appropriate because Johnson controlled Owings throughout the fraudulent scheme. Owings, said the court, "was the vehicle for [Johnson's] acknowledged fraud." J.A. 194.

8

The court therefore ordered Johnson to disgorge $681,554. It also ordered Johnson to pay a penalty equal to his disgorgement amount. The Commission had sought a $3.1 million penalty—reflecting the gross investor proceeds the scheme captured. Johnson, meanwhile, had asked for (at most) a $156,963 penalty—his personal gross pecuniary gain. Because the SEC's requested penalty was "a stretch," the court thought Johnson's disgorgement figure a more appropriate guide for the penalty. J.A. 194.

E.

The court elaborated on its ruling in a written opinion. *SEC v. Owings Grp., LLC*, No. 18-cv-2046, 2021 WL 1909606 (D. Md. May 12, 2021). It noted that "*Liu*'s holding did not eliminate a court's authority to order disgorgement in a joint and several manner." *Id.* at *4. Rather, it left undisturbed a district court's ability to "order[] individuals to disgorge funds received by corporate entities under their control." *Id.* And in this case, "[i]mposing joint and several liability on Johnson and an entity he control[led] [was] entirely consistent with *Liu* and with established precedent in securities[-]enforcement cases." *Id.*

The SEC demonstrated that $524,591 of investor funds were deposited into Owings's accounts, which Johnson "used to perpetrate his fraud." *Id.* Accordingly, the court "ordered [Johnson] to pay his individual compensation of $156,963 in disgorgement, in addition to $524,591 in disgorgement jointly and severally with" Owings.[5] *Id.*

---

[5] The district court also ordered disgorgement against Johnson's codefendants: $225,750 against Drost; $142,058 against Koslow; and $149,204 against Waltzer. And each individual defendant paid prejudgment interest.

As for the civil penalty, the court said that such penalties "are intended to punish[] and label defendants wrongdoers." *Id.* at *6 (quoting *Gabelli v. SEC*, 568 U.S. 442, 452 (2013)). The district court found that Johnson's scheme involved fraudulent and "recurrent knowing, egregious conduct that caused substantial investor losses," satisfying several of the factors courts routinely consider when assessing civil penalties. *Id.* So the court agreed that "a *reduced* monetary penalty [was] appropriate against [] Johnson as the orchestrator of the fraud." *Id.*

The district court rejected the $3.1 million penalty the SEC sought as unjustified and "unduly punitive." *Id.* at *7. Instead, it found that a penalty of $681,554 against Johnson was appropriate. This amount mirrored the total disgorgement order and the penalty amounts the SEC sought to impose on Johnson's codefendants. Finally, it declined to impose a penalty on Johnson's codefendants, "[t]aking into consideration their respective financial conditions, the degree of their knowledge, and their roles in the fraud." *Id.*

This appeal followed.

## II.

Before us, Johnson argues that the district court erred in finding him jointly and severally liable for disgorgement with Owings because he personally received only $156,963 from the fraudulent scheme. Ordering disgorgement under these circumstances, he asserts, doesn't "comport with typical principles of equity, particularly those concerning unjust enrichment." Appellant's Br. at 9–10. And because the civil penalty was based on

10

this "errant" disgorgement award, it was "clearly erroneous and arbitrary."  *Id.* at 10.

Moreover, says Johnson, the district court failed to "adequately consider [his] insolvent

financial condition" when assessing the penalty, amounting to an abuse of discretion.  *Id.*

We disagree on all fronts.

## A.

We begin with Johnson's objection to the joint-and-several disgorgement order.

"We review a district court's decision to award equitable relief for abuse of discretion,

accepting the court's factual findings absent clear error, while examining issues of law de

novo."  *Porter v. Clarke*, 923 F.3d 348, 364 (4th Cir. 2019) (cleaned up).  The propriety of

joint-and-several disgorgement under 15 U.S.C. § 78u(d)(5)[6] is one such issue of law we

review de novo.

## 1.

A word about *Liu*.  The case involved a married couple who defrauded foreign

nationals under the EB-5 Immigration Investor Program.[7]  *Liu*, 140 S. Ct. at 1941.  Rather

than use the nearly $27 million they solicited to finance a cancer-treatment center (as

---

[6] The SEC argues that § 20(a) of the Exchange Act, which concerns control-person liability, authorizes joint-and-several liability.  *See* Appellee's Br. at 18.  But the Commission didn't pursue this argument in its remedies motion or before the district court. So we decline to consider it for the first time on appeal.

[7] The U.S. Citizenship and Immigration Services administers the EB-5 Program, which "permits noncitizens to apply for permanent residence in the United States by investing in approved commercial enterprises that are based on 'proposals for promoting economic growth.'"  *Liu*, 140 S. Ct. at 1941 (quoting U.S. Citizenship & Immigr. Servs., EB-5 Immigrant Investor Program, https://uscis.gov/eb-5).  "Investments in EB-5 projects are subject to the federal securities laws."  *Id.*

promised), Charles Liu funneled over $20 million to himself, his wife, and associated marketing companies. *Id.* at 1941–42. The district court green lit the SEC's joint-and-several disgorgement request against the couple for the full amount they raised from investors. *Id.* at 1942. The Ninth Circuit then affirmed. *Id.*

The Supreme Court in *Liu* answered a narrow question—"whether [15 U.S.C.] § 78u(d)(5) authorize[d] the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing." *Id.* The Court required the SEC to deduct legitimate business expenses from its disgorgement calculations, but it otherwise found that disgorgement remained a valid equitable remedy. *Id.* at 1950.

But the *Liu* Court also cautioned that joint-and-several disgorgement could "test the bounds of equity practice." *Id.* at 1946. Imposing liability in this way, the Court explained, was "seemingly at odds with the common-law rule requiring individual liability for wrongful profits." *Id.* at 1949. Thus, joint-and-several liability "could transform any equitable profits-focused remedy into a penalty." *Id.* And that in turn "runs against" the favored rule to "hold[] defendants liable . . . for such profits only as have accrued to themselves . . . and not for those which have accrued to another, and in which *they have no participation*." *Id.* (cleaned up) (emphasis added).

Even so, the Court found that the common law didn't bar all collective liability. *Id.* In fact, it was appropriate "for partners engaged in concerted wrongdoing." *Id.* Rather than "wade into all the circumstances where [disgorgement] might be punitive when applied to multiple individuals," however, the *Liu* Court left it to the lower courts to determine the propriety of joint-and-several liability in each case. *Id.*

As for the defendants in *Liu*, the Court noted that they were married, and both engaged in fraudulent conduct. *Id.* The couple also failed to show that "their finances were not commingled," "that one spouse was a mere passive recipient of the profits," "or that one spouse did not enjoy the fruits of the scheme." *Id.* Such a showing, said the Court, might "render a joint-and-several disgorgement order unjust." *Id.* But it declined to rule definitively, remanding the case instead. *Id.*

2.

With *Liu* firmly in mind, we turn now to Johnson. He posits that his case presents "an ideal opportunity to rule on [1] whether, and [2] to what extent, a control person defendant in an SEC enforcement action may be found jointly and severally liable for disgorgement with the entity he controls." Appellant's Br. at 9.

But the *Liu* Court answered Johnson's first question. Had the Court wanted to prohibit joint-and-several disgorgement, it could have. Indeed, the dissent suggested doing just that. *Liu*, 140 S. Ct. at 1950 (Thomas, J., dissenting) ("Disgorgement can never be awarded under 15 U.S.C. § 78u(d)(5)."). Instead, the Court only set limits on collective liability. And it remanded the case to the lower court to determine whether the defendants were "partners in wrongdoing." *Id*. at 1949.

3.

We're left then with Johnson's second question on the proper scope of joint-and-several disgorgement against a control person. Put plainly, we must decide whether the district court's joint-and-several disgorgement order was warranted. Given Johnson's control of Owings and Owings's conduct in the scheme, we find it was.

We agree with the district court that Johnson and Owings were "partners engaged in concerted wrongdoing." *Owings Grp.*, 2021 WL 1909606, at \*4 (quoting *Liu*, 140 S. Ct. at 1949). On that point, we need look no further than the ample evidence of Owings's wrongdoing.

The allegations in the SEC's complaint describe Owings's misrepresentations to investors: that Owings created false impressions about the investment program's success; that Owings assured investors of a return with no factual basis; and that Owings helped create shell companies to mollify—and mislead—investors. Not to mention that Owings promoted the program at investor conferences, falsely represented how investor proceeds would be used, and supplied prospective investors with agreements to participate in the program. And Johnson and his salespeople deposited all investor proceeds into Owings's bank accounts. That money was then transferred to accounts Johnson owned or controlled.

Against this backdrop, Johnson's control of Owings means more to the joint-and-several-disgorgement inquiry than Johnson admits. His level of control was no passive thing. Johnson founded the company and served as its Chief Executive Manager and controlling member.[8] He "had the power to make decisions on behalf of the company, hire and fire employees, control the Owings bank accounts, and develop and implement

---

[8] Johnson underscores that he "was one of three members . . . of Owings," so he shared management of the company with others. Reply Br. at 16. But this fact is of no moment. Johnson had majority control of Owings and thus "had the ability to control, and did control, [the others'] conduct." J.A. 24.

14

company policies." J.A. 19. In short, Owings's conduct in the scheme generated its ill-gotten gains—and Johnson controlled that conduct.

4.

Johnson's contrary arguments are unavailing. He complains that the district court's order "boil[ed] down to the simple notion that [he] controlled Owings." Reply Br. at 15. But, as we've illustrated, Johnson's control of Owings—and his partnership *with* Owings—is neither simple nor a notion. The SEC's complaint exhaustively details Johnson's and Owings's partnership from the start of the scheme to its demise.

In rebuttal, Johnson offers *SEC v. Yang*, No. 15-cv-02387, 2021 WL 1234886 (C.D. Cal. Feb. 16, 2021), *appeal filed*, No. 21-55437 (9th Cir. Apr. 30, 2021). Johnson argues that the standard for joint-and-several disgorgement in *Yang* wasn't simply whether a "primary violator" controlled an entity, but whether the entity's ill-gotten gains "accrued" to that violator. Reply Br. at 17.

In *Yang*, the court assessed whether to impose disgorgement jointly and severally against a named defendant (Yang) and several relief defendants. *Yang*, 2021 WL 1234886, at *8. In a securities enforcement action, a relief—or nominal—defendant "is part of a suit only as the holder of assets that must be recovered in order to afford complete relief." *CFTC v. Kimberlynn Creek Ranch, Inc.*, 276 F.3d 187, 192 (4th Cir. 2002). Thus, "no cause of action is asserted against [them]." *Id.*

The scheme in *Yang* resembled the one in *Liu*. Yang, like Liu, purported to raise money from investors so those investors could qualify for the EB-5 program. *Yang*, 2021 WL 1234886, at *1 & n.2. "The funds were allegedly going to be used to develop sub-

15

acute nursing care facilities." *Id.* at *1. Instead, Yang "diverted substantial portions of the investors' money for [his] own benefit," "us[ing] it on unrelated projects and other purposes that were contrary to the representations made to investors." *Id.* at *2. As part of the scheme, Yang deposited the funds in several entities he owned—the relief defendants. *Id.* at *1–2.

The SEC sought to impose joint-and-several disgorgement on Yang and the relief defendants. *Id.* at *2. The court's analysis on this point was straightforward: it asked whether the relief defendants' ill-gotten funds "accrued" to Yang. *Id.* at *8.

For two of the relief defendants, the court said no and refused to order joint-and-several disgorgement. *Id.* at *9. Though the relief defendants received a portion of investors' funds they weren't entitled to, the court didn't find that those funds accrued to Yang. *Id.* at *8. Instead, the funds went toward payments on construction loans and for a land parcel that the SEC didn't sufficiently connect to Yang.[9] *Id.*

As in *Yang*, the SEC named several relief defendants in this case. But Owings wasn't one of them. Rather, Owings (through Johnson), furthered the fraudulent scheme at every turn. It was no mere "holder of assets." *Kimberlynn Creek Ranch*, 276 F.3d at 192. It misrepresented, created, assured, and promoted—a string of wrongdoing all in Johnson's service. And Johnson wore "just about every hat of importance in the company."

---

[9] The court also considered whether the funds were "legitimate expenses" (and thus excludable) under *Liu* and whether there was a "reasonable approximation" of the funds that may have accrued to Yang. *Id.* Johnson doesn't raise similar concerns here.

16

*SEC v. Westport Cap. Mkts.*, 547 F. Supp. 3d 157, 171 (D. Conn. 2021). We find *Yang* a poor guide for our inquiry given the inextricable relationship between Owings and Johnson.

This is all the more so because a relief defendant is in a very different (and far less culpable) position than a named defendant like Owings. After all, a relief defendant isn't even accused of wrongdoing. *See Kimberlynn Creek Ranch*, 276 F.3d at 192.

Johnson calls this a "distinction without a difference." Reply Br. at 18. But given the fact-intensive inquiry *Liu* demands in determining liability for equitable remedies, we can't agree. *See Liu*, 140 S. Ct. at 1949 (asking lower court on remand to determine whether "the facts are such" that defendants could be "found liable for profits as partners in wrongdoing or whether individual liability is required").

*SEC v. Westport Capital Markets* underscores this distinction. 547 F. Supp. 3d at 171–72. There, the district court found it "plainly reasonable" to impose joint-and-several disgorgement in a case involving an individual and his entity (Westport).[10] *Id.* at 171.

The defendant owned Westport and occupied several of its executive positions, including president. *Id.* And it was "beyond dispute that Westport and [the defendant] each received substantial benefits from their concerted, wrongful activities." *Id.* By ordering joint-and-several disgorgement, the court didn't impose shared liability "on mere 'affiliates' or those with 'no participation' in the unlawful scheme." *Id.* (quoting *Liu*, 140 S. Ct. at 1949). The same is true here.

---

[10] The defendants didn't argue against joint-and-several disgorgement in *Westport Capital Markets*. *Id.* at 171. But the court still justified its disgorgement order by discussing *Liu* and the facts supporting joint-and-several liability. *Id.*

17

Johnson next asserts the SEC didn't allege that his funds were commingled with Owings's—and that the lack of such evidence (as explained in *Liu*) renders joint-and-several disgorgement unjust. Rather, his "net profits were no more than four percent of the total [] investor funds." Appellant's Br. at 15. So, contends Johnson, requiring him to disgorge Owings's ill-gotten gains (along with his own) transforms an equitable remedy into a penalty. We disagree.

When *Liu* discussed commingling funds, it did so in the context of two *individuals*—a married couple. And while the Court declined to "wade into all the circumstances where [disgorgement] might be punitive when applied to multiple individuals," it did offer two examples: if "one spouse was a mere passive recipient of profits" or "did not enjoy the fruits of the [fraudulent] scheme." *Liu*, 140 S. Ct. at 1949.

But the Court's analysis says little about whether disgorgement is appropriate when the wrongdoers are an entity and a control person. For one thing, there's no way for an entity to *actively* receive the scheme's profits or enjoy the scheme's fruits except through its control person.

At bottom, *Liu* permits joint-and-several disgorgement for "partners engaged in concerted wrongdoing." *Id.* To this, Johnson says that the SEC made "no showing" that he and Owings "were 'partners' in any sense." Reply Br. at 16 (referencing a dictionary definition of "partner" in context of corporate veil-piercing). But considering Johnson's and Owings's coordinated roles in perpetrating the scheme, this contention falls flat. It's hard to imagine what would amount to concerted wrongdoing between an entity and its control person if not this case.

18

We're mindful, of course, that district courts shouldn't "award[] disgorgement in . . . ways that test the bounds of equity practice[.]" *Liu*, 140 S. Ct. at 1946.  But we don't believe the district court exceeded those bounds here.  Accordingly, we affirm the district court's disgorgement order.

## B.

We next address Johnson's argument that the district court erred in imposing a civil penalty that exceeded his gross pecuniary gain.  We review the district court's chosen penalty for abuse of discretion.  *See Porter*, 923 F.3d at 364.  And Johnson's burden to show such an abuse "necessarily is a heavy one." *SEC v. Rajaratnam*, 918 F.3d 36, 41 (2d Cir. 2019) (cleaned up).  "[W]e will reverse only if we have a definite and firm conviction that the court below committed a clear error of judgment in the conclusion that it reached upon a weighing of the relevant factors." *Id.* (cleaned up).

As the district court rightly noted, civil penalties (unlike disgorgement) "'are intended to punish[] and label defendants wrongdoers.'"  J.A. 230 (quoting *Gabelli*, 568 U.S. 452).  Here, the SEC sought a penalty of $3.1 million, the scheme's total investor proceeds, while Johnson sought either no penalty or $156,963, his personal gain.

The district court found both recommendations off-base and instead imposed a penalty of $681,554, which mirrored the disgorgement amount.

Johnson contends that the district court impermissibly premised the civil penalty on joint-and-several liability, as it did for disgorgement.  Then he asserts that the court failed to adequately consider his insolvency.  We're unpersuaded by either argument.

19

1.

Johnson's first argument is essentially this: The district court imposed disgorgement of $681,554, jointly and severally. It then imposed a penalty of $681,554. And because the penalty amount was equal to the disgorgement amount, it too must have been imposed jointly and severally.

Johnson points out that several circuits have held that "civil penalties in SEC enforcement actions cannot be awarded on a joint-and-several basis." Appellant's Br. at 23–24 (citing *SEC v. Pentagon Cap. Mgmt., PLC*, 725 F.3d 279 (2d Cir. 2013) and *SEC v. Milan Grp., Inc.*, 595 F. App'x 2 (D.C. Cir. 2015) (per curiam)).[11] Doing so would defy the principle that a civil penalty should "be based on the 'gross amount of pecuniary gain to such defendant.'" *Pentagon Cap. Mgmt.*, 725 F.3d at 288 (quoting 15 U.S.C. § 77t(d)(2)).

But Johnson misconstrues the district court's order. In fact, as Johnson concedes, the court didn't "expressly order[] a 'joint-and-several' penalty." Appellant's Br. at 22. Nor could it when it didn't impose any penalty against Owings.

Rather, the district court tethered Johnson's penalty to the amount of disgorgement. The SEC sought penalties against Johnson's codefendants that matched their disgorgement amounts yet requested a much higher penalty against Johnson. The court refused to abide this inconsistency. *See* J.A. 194 ("[B]ut in fairness to Johnson, I'm trying to consistently

---

[11] Ironically, the courts in both cases affirmed a joint-and-several disgorgement award between an individual defendant and his entity. *See Pentagon Cap. Mgmt.*, 725 F.3d at 288; *Milan Grp.*, 595 F. App'x at 3.

20

calculate the monetary fine to be consistent with that figure from disgorgement.")  So the court used Johnson's disgorgement figure as a guide.

Simply put, the court didn't order a joint-and-several penalty.  It ordered a penalty equal to Johnson's disgorgement, which happened to be joint and several.  Johnson's objection notwithstanding, we think this is a distinction *with* a difference.

2.

Last, Johnson contends the district court ignored his insolvency when it ordered his monetary penalty.  He (like his codefendants) provided uncontroverted information about his dire financial straits.  But, says Johnson, the court didn't discuss that information before imposing an "unduly punitive" penalty.  Appellant's Br. at 27–28.  We find that the court didn't abuse its discretion in balancing Johnson's insolvency against his role in the scheme.

One factor courts routinely consider in assessing a penalty is "whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *Rajaratnam*, 918 F.3d at 44.  The others are: "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; [and] (4) whether the defendant's conduct was isolated or recurrent."  *Id.*[12]  These factors, however, are neither "exhaustive" nor should they "be taken as talismanic."  *Id.* at 45.

---

[12] Johnson only challenges the district court's consideration of his financial condition.

The district court heard lengthy arguments about each of the defendants' finances. It probed the SEC to justify the civil penalties against Johnson's codefendants given their financial troubles. Finding the Commission's proffered explanation "woefully insufficient," the court declined to impose a penalty against Johnson's codefendants. J.A. 207. Doing otherwise would create judgments that were "uncollectible and serve[d] no purpose." J.A. 205.

The court took a different view of Johnson's situation. While acknowledging his plea of insolvency, the court found that Johnson "continually ignor[ed]" his control of Owings, "the vehicle for [his] fraud." J.A. 194. The court also recounted that Johnson consented to a third-tier violation of the securities laws. Such a violation involves "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and "directly or indirectly result[s] in substantial losses or create[s] a significant risk of substantial losses." 15 U.S.C. § 77t(d)(2)(C); *see also* J.A. 230.

The court then listed the five factors, which similarly measure a defendant's culpability. And because of Johnson's control of Owings, the court found him in "a far different situation" than his codefendants. J.A. 211. Still though, the court imposed only a reduced penalty against him.

In its written opinion, the court again recited the five factors and contrasted Johnson's and his codefendants' roles in the scheme. *Owings Grp.*, 2021 WL 1909606, at *6–7. It noted that "all" the defendants pointed to "their dire financial situations and inability to pay any monetary penalty." *Id.* at *7. "In light of [those] considerations," the

22

court found the SEC's requested penalty against Johnson "not justified" and "unduly punitive." *Id.*

We find no abuse of discretion. Though the district court didn't explicitly discuss Johnson's financial situation, it's clear to us that the court considered it, along with the remaining factors. The court understood that all the defendants were insolvent but decided that Johnson's substantially more serious role in the scheme warranted a penalty all the same.

In other contexts, we don't require a "ritualistic incantation" of factors "to establish [the court's] consideration of a legal issue." *United States v. Davis*, 53 F.3d 638, 642 (4th Cir. 1995) (supervised release). The court's analysis of such factors can be "implicit" as long as it "rule[d] on [the] issues that have been fully presented for determination." *Id.* We find that standard easily met here, given the court's extensive deliberation on Johnson's civil penalty, both at the hearing and in its written opinion.[13]

*AFFIRMED.*

---

[13] Johnson concedes that a district court may "disregard [a] defendant's financial condition" if aggravating circumstances exist. Appellant's Br. at 26. Though we don't think the court did that here, we note that Johnson is a recidivist offender. And he began this scheme not long after he pleaded guilty to securities fraud and conspiracy to commit securities fraud and while the parallel civil proceedings were ongoing.